UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| CHAD BLANCHARD | ) | IN ADMIRALTY |
| | ) | |
| VERSUS | ) | CIVIL ACTION NO.  12-3140 |
| | ) | |
| THE UNITED STATES OF AMERICA THROUGH ITS AGENCY THE UNITED STATES ARMY CORPS OF ENGINEERS | ) ) ) | MAGISTRATE JUDGE HANNA |

### UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSTIONS OF LAW

COMES NOW, Defendant United States of America, through undersigned counsel, and respectfully submits its proposed Findings of Fact and Conclusions of Law, in accordance with the Court's Order.

### UNITED STATES' PROPOSED FINDINGS OF FACT

1. On Thursday, August 18, 2011, the M/V MISSISSIPPI, a public vessel operated by the U.S. Army Corps of Engineers ("Army Corps"), traveled the length of the Atchafalaya River southbound, transporting members of the Mississippi River Commission on the Commission's annual low-water inspection trip.  Established by Congress in 1879 (33 U.S.C. § 641, *et seq*.), the Commission is mandated with making semi-annual river inspection trips during which it holds public.  33 U.S.C. § 646.  The MISSISSIPPI serves as the Commission's headquarters and general offices, *see id*.  The MISSISSIPPI contains meeting facilities and serves as a floating town hall that brings the Commission to riverside communities.

2. On that date, the MISSISSIPPI traversed the length of the Atchafalaya River, from Mile 1 to Berwick, Louisiana, at Mile 121.2.  At about 3:21 p.m., the MISSISSIPPI passed the towboat M/V ALLURA, which was moored at a dock on the river's west bank at Mile 85.7.

1

3.     Plaintiff Chad Patrick Blanchard ("Mr. Blanchard"), a contract deckhand aboard towboat M/V ALLURA, and by Defendant Stallion Oilfield Services, Ltd. ("Stallion"), the owner of the ALLURA, allege that the MISSISSIPPI passed the ALLURA at an unsafe speed and generated an excessive wake that caused Mr. Blanchard to fall and be injured. Stallion also alleges that the MISSISSIPPI failed keep a proper lookout. The United States denies these allegations. Stallion does not claim any damage to the ALLURA.

4.     The MISSISSIPPI was built in 1993 by Halter Marine, in Moss Point, Mississippi. It is a triple-screw towboat with a length over all of 241 feet, a beam of 58 feet, a draft of 8.0 – 9.0 feet from waterline to keel, and displaces 2,135 long tons. It is powered by three Caterpillar diesel engines producing roughly 6,300 HP. During its semi-annual inspection trips, the MISSISSIPPI pushes two empty 130 foot x 30 foot double ended barges, tied up abreast. These deck barges draw approximately 1 foot of water and permit passengers to board and disembark at docks where the water is shallow.

5.     Aboard the MISSISSIPPI that afternoon, Assistant Master Leo Hendrix and Steersman Mate Cary Lewis were on the navigation watch, which ran from noon to 6 p.m. Both men are employees of the Army Corps. Both held appropriate merchant mariner credentials and were experienced crewmembers.

6.     The MISSISSIPPI's navigation logbook records the MISSISSIPPI entering the Atchafalaya River upstream at Mile 1 at 9:00 a.m. At 12:15 p.m., the vessel stopped at the Atchafalaya Campground Landing, Mile 45.8, to allow some passengers to embark and disembark. At 12:35 p.m., the MISSISSIPPI departed downriver. In the pilot house, Captain Lewis was at the controls and Captain Hendrix was serving as lookout.

7.     The MISSISSIPPI and Stallion's vessel, the M/V ALLURA, transmit Automatic Identification System (AIS) signals, which include vessel identification information, latitude and

longitude, speed over ground (in knots), and course over ground.  This permits vessels using the system to "see" each other on their AIS displays even before visual contact is possible.  The time when an AIS signal is received is synchronized to a clock maintained in the USCG Operations Systems Center.  In this case, the AIS signals of both vessels were being received by the same USCG Vessel Traffic Service base station in Port Allen, Louisiana.

8. The Nationwide AIS database is maintained by the U.S. Coast Guard and most information is available to the public.  The parties are expected to stipulate that latitude, longitude and time reported for the M/V ALLURA's AIS signals are accurate and reliable.  The parties are also expected to stipulate that that the positions, as well as speed and course over ground, for the M/V MISSISSIPPI, are also accurate and reliable.

9. The distances between the vessels map coordinates, expressed in meters, were not transmitted by the vessels, but were later calculated by the Coast Guard at the request of the United States.  They represent straight-line distances between the reported positions of the vessels.  These distances can be verified using measurement tools available in popular mapping programs, such as Google Earth, with only minor differences.

10. The location and movements of the vessels involved in this case can be referenced on Map No. 23 of the Army Corps of Engineers' 2007 Navigation Maps ("Map No. 23"), Atchafalaya River System and Outlets to Gulf of Mexico.

11. Captain Lewis was at the controls when the MISSISSIPPI passed south of Mile 83, which can be seen at the top of Map No. 23.

12. Captain Lewis picked up the ALLURA's AIS signal at least 1½ miles upriver.

13. As the MISSISSIPPI rounded a bend in the river, Captain Lewis looked for and made visual contact with the ALLURA.  He then began slowing the vessel, at which time

Captain Hendrix relieved him at the controls in a normal position change. During the relief briefing, Captain Lewis pointed out the ALLURA to Captain Hendrix.

14. Based on his experience with conditions on the Atchafalaya River during numerous low-water inspection trips aboard the MISSISSIPPI, Captain Lewis estimated that the current flowing with the vessel was approximately 1½ to 2 miles per hour.

15. The AIS data shows that at 3:16:04 p.m., the MISSISSIPPI started slowing its speed, still more than a mile upriver from the ALLURA.

16. By 3:17:54 p.m., the MISSISSIPPI was about 2/3 miles had established a stable speed of about 11½ miles per hour over ground, about 2/3 miles upriver from the ALLURA . In light of the current, the MISSISSIPPI's through-the-water speed was between 9½ and 10 miles per hour.

17. At 3:20:25 p.m., the MISSISSIPPI's speed dropped to approximately 11¼ miles per hour 2/10ths of a mile upstream, or between 9¼ and 9¾ miles per hour through the water.

18. The MISSISSIPPI held at or under this speed through 3:21:15 p.m., when it passed closest to the ALLURA from mid-channel, then resumed speed after leaving the ALLURA astern.

19. The MISSISSIPPI saw no cause for concern as it passed the ALLURA and did not receive any radio calls from the smaller vessel after it passed. Nor is there evidence of any other vessel hearing such a call.

THE ALLURA

20. The ALLURA is small towboat owned and operated by Stallion. It has twin-screws, a length over all of 45 feet, a beam of 18 feet, and draws 6.5 feet.

21. In the afternoon of August 18, 2011, the M/V ALLURA was moored at a dock owned by Hilcorp Energy Corporation, which is not a party to this suit. The dock is at Mile 85.7.

22. Which direction the ALLURA was facing while moored is in dispute. Mr. Blanchard claims that the ALLURA's bow was facing downriver, stern into the current. Captain Harris Knott, the ALLURA's master, testified the bow was facing upriver, as he had been taught to do. And Mr. Troy Simar, Jr., a crew boat pilot who collected Captain Knott from the ALLURA to go upriver prior to the alleged incident, also remembered that the ALLURA's bow was pointing up river because he had pulled along its starboard side to take Captain Knott aboard.

23. Before Captain Knott left the ALLURA, he instructed Mr. Blanchard, the only crewmember left on board, to call him on his cell phone if any problems arose. Mr. Blanchard and Captain Knott had each other's phone numbers. Mr. Blanchard was an experienced deckhand and had once held a master's license himself.

24. After Captain Knott left for the day, Mr. Blanchard was alone on the after deck when he spotted the MISSISSIPPI coming around the bend upriver, a mile or more away. Mr. Blanchard did not watch the MISSISSIPPI pass, but went to change the oil in the engine room.

25. To get to the engine room from the after deck, Mr. Blanchard passed through a doorway facing astern with an 8-inch coaming into an interior space, where a ladder-like stairway with five or six steps leads down to the engine room deck. The stairway has a single steel handrail that, when facing the steps, would be to the left hand side.

26. Just before he fell, Mr. Blanchard stood on the narrow top of the stairway with two one-gallon jugs of oil in his left hand, preparing to descend the stairs. He turned around to descend facing the stairway as one would descend a ladder and, in the same movement, switched

5

the two one-gallon jugs from his left hand to his right hand so that he could grip the railing on his way down. It was during this transition, as he pivoted on the narrow landing while switching the two one-gallon jugs of oil from his left hand to his right, that he fell down the stairs. Mr. Blanchard attributes his fall to a sudden upset of the ALLURA caused by an allegedly excessive wake from the MISSISSIPPI, although he did not actually see the wake.

27. Mr. Blanchard says he took a moment to recover his senses before climbing back up from the engine room. He did not try to phone Captain Knott or reach him by radio to report his injury. He did not try to call Stallion, or the Coast Guard, or the 24-hour emergency phone number posted on the dock. Mr. Blanchard maintains that he radioed the MISSISSIPPI from the ALLURA's pilothouse in anger, but the navigation watch on the MISSISSIPPI did not hear any such call. Nor is there any evidence that any other vessel heard such a call.

### Hydrodynamic Analysis of the MISSISSIPPI's Wakes

28. Dr. Arthur M. Reed, Ph.D., is offered by the United States as a hydrodynamics and wake expert. He is a civilian Navy employee with the Carderock Division, Naval Surface Warfare Center, in Maryland.

29. Dr. Reed calculated that the initial the bow wake reaching the ALLURA from its position mid-channel would be 0.9 feet high, and would induce heave less than 2 inches, pitch less than 0.5 degrees, and roll less than 1 degree. The following stern wake, reaching the ALLURA slightly later, would have been double in size and effect, but still not enough to cause someone standing properly on the ALLURA to lose balance or even grab for support. It also would have been preceded by at least a dozen smaller oscillations that would have alerted anyone on board of the wake.

### Testimony from Crew Boat Witnesses Is Irrelevant

30. Plaintiff Blanchard and cross-claimant Stallion seek to introduce testimony from Captain Knott and Mr. Simar about their encounter with the MISSISSIPPI aboard a 26-foot outboard motorboat (the "crew boat") as they traveled upriver from the ALLURA shortly before the alleged wake incident. But their encounter with the MISSISSIPPI was too far away to be relevant to what occurred when the MISSISSIPPI passed the ALLURA, which was around a bend and two miles downriver at Mile 85.7. None of the men in the crew boat could see the MISSISSIPPI as it passed the ALLURA.

31. Although Captain Knott purportedly observed an excessive wake from the MISSISSIPPI while he was aboard the crew boat, he did not attempt to call his deckhand by mobile phone or radio to alert him to any potential dangers, nor did he attempt to radio the MISSISSIPPI to communicate his concerns about its wake. Captain Knott only learned about the alleged wake incident and Mr. Blanchard's injury when he returned to the ALLURA the next day.

32. No other vessel on the Atchafalaya River that day reported an excessive wake from the MISSISSIPPI.

### Mr. Blanchard's Damage Claims

33. Plaintiff has inaccurately asserted his lost wage claim. Because Plaintiff did not work a consistent schedule, the calculation of his lost wage claim is considerably lower than $265 per day he seeks.

34. When Plaintiff is released to medium duty work, as expected, he will be eligible to return to his duties as a ship captain. At that time, his wage loss will be reduced to zero.

PROPOSED CONCLUSIONS OF LAW

1. This case comes within the admiralty jurisdiction of this Court. 28 U.S.C. § 1333. The M/V MISSISSIPPI is a public vessel of the United States. The Public Vessels Act, 46 U.S.C. §§ 31101-31113, provides a limited waiver of sovereign immunity whereby, "A civil action in personam in admiralty may be brought, or an impleader filed, against the United States for – (a) damages caused by a public vessel of the United States . . . ." 46 U.S.C. § 31102. This Court has subject-matter jurisdiction over Plaintiff's complaint against Defendant United States.

2. "A ship passing piers or docks where other vessels are moored is obligated to use reasonable care to proceed carefully and prudently so as to avoid causing swells or suctions effects that may damage properly moored vessels or shore installations." 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 14-2, at pp. 120-1 (5th Ed. 2011).

3. "A vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion." *Moran v. M/V GEORGIE MAY*, 164 F. Supp. 881, 884 (S.D. Fla. 1958). Negligent operation of a vessel which causes a wake which does injury or damage to a person or property can be the basis for imposing liability. *Sweeny v. Car/Puter Intern. Corp.*, 521 F. Supp. 276, 285 (D.C.S.C. 1981.)

4. Although the Fifth Circuit recognizes the fact that injury from swells establishes a *prima facie* liability of the vessel creating the swell, *West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673 (5th Cir. 1951), where there is no damage to a vessel, no such presumption should apply. *See Maxwell v. Hapag-Lloyd Aktiengesellschaft*, 862 F.2d 767, 769 (9th Cir. 1988) ("A presumption of fault does not extend to personal injuries occurring as a result of a fall on properly moored vessels that do not themselves suffer damage."). *See Gregg v. Week Marine, Inc.*, 2000 WL 798493 at *4 (E.D. La. June 21, 2000) (citing *Maxwell* with approval.).

5.      Rule 5 of the Inland Navigation Rules provides: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. There is no evidence that the pilots of the MISSISSIPPI violated this rule when their vessel passed the ALLURA.

6.      Rule 6 of the Inland Navigation Rules provides:

Safe Speed. Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

   (i) The state of visibility;

   (ii) The traffic density including concentrations of fishing vessels or any other vessels;

   (iii) The manageability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

   (iv) At night, the presence of background light such as from shore lights or from back scatter from her own lights;

   (v) The state of wind, sea and current, and the proximity of navigational hazards;

   (vi) The draft in relation to the available depth of water.

(b) Additionally, by vessels with operational radar:

   (i) The characteristics, efficiency and limitations of the radar equipment;

   (ii) Any constraints imposed by the radar range scale in use;

9

> (iii) The effect on radar detection of the sea state, weather and other sources of interference;
>
> (iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;
>
> (v) The number, location and movement of vessels detected by radar;
>
> (vi) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

33 U.S.C. § 83.06.

The evidence shows that the pilots of the MISSISSIPPI did not violate the inland safe speed rule or the proper lookout rule when it passed the ALLURA.

7. Mr. Blanchard brings his negligence action against the United States under general maritime law. He is not a Jones Act seaman as to the United States. In order to prevail, Mr. Blanchard has the burden to prove that the negligence of the United States is the "'legal cause' of [his] injuries." *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992). This means that "the negligence must be a 'substantial factor'" in causing the injury. *Thomas v. Express Boat Co., Inc.*, 759 F.2d 444, 449 (5th Cir. 1985). Accordingly, Mr. Blanchard has the burden to prove "more than 'but for the negligence, the harm would not have resulted.'" *Donaghey*, 974 F.2d at 649 (citations omitted).

8. Mr. Blanchard's potential recoverable damages under general maritime law are comprised of three "base components:" past wage loss, future wage loss, and pain and suffering. *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 898 (5th Cir. 1989), (*mod. in part, aff'd in part*) 929 F.2d 191 (5th Cir. 1991). His burden requires him to prove that "he suffered damages," which "is essential to [his] negligence claim . . . ." *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1236 (S.D. Fla. 2006).

9. Awards for future wage loss are calculated "based on the difference between what [the Plaintiff] could have earned ['but for' the injury] and what [the Plaintiff] is able to earn." *Masinter*, 867 F.2d at 899. This element of damages is usually listed as the "loss of future earning capacity." *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995). The item is discussed as the "loss of the plaintiff's future earning capacity" *Culver v. Slater Boat Co.*, 688 F.2d 280, 288 (5th Cir. 1982) (*withdrawn in part*) 722 F.2d 114 (5th Cir. 1983).

10. An award of damages for pain and suffering "must necessarily depend to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation." *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir. 1983).

11. If the United States is found liable for Mr. Blanchard's injuries, the general maritime law provides that Mr. Blanchard's own comparative negligence will reduce his recovery by the percentage of his causative negligence. *Miles v. Melrose*, 882 F.2d 976, 981 (5th Cir. 1989), *aff'd*, 498 U.S. 19 (1990). Mr. Blanchard, knowing the MISSISSIPPI was approaching the ALLURA, nevertheless acted carelessly at the top of a steep stairway where the slightest upset of the vessel would have caused him to lose balance. Mr. Blanchard ignored the vessel he had seen coming his way.

12. In the event liability is deemed shared by the United States and Stallion, damages should be apportioned proportionally to the degree of each defendant's fault, according to the rule of comparative negligence. *U.S. v. Reliable Transfer Co., Inc.*, 421 U.S. 397 (1975), *on remand*, 522 F.2d 1381 (2d Cir. 1975).

**WHEREFORE**, Defendant UNITED STATES OF AMERICA, prays that judgment be entered dismissing the Complaint of Plaintiff Chad Blanchard and the Cross-Claim of Defendant Stallion Oilfield Services, Ltd., against the United States.

DATED: June 4, 2014

                                                  Respectfully submitted,

                                                  STUART F. DELERY
                                                  Acting Deputy Assistant Attorney General

                                                  STEPHANIE A. FINLEY
                                                  United States Attorney

                                                  JENNIFER B. FREDERICK (#23633)
                                                  Assistant United States Attorney

                                                  /s/ Stephen M. Ketyer
                                                  STEPHEN M. KETYER
                                                  Trial Attorney
                                                  Aviation & Admiralty Litigation Section
                                                  Torts Branch, Civil Division
                                                  U.S. Department of Justice
                                                  Post Office Box 14271
                                                  Washington, DC 20044-4271
                                                  stephen.ketyer@usdoj.gov
                                                  (202) 616-4034
                                                  (202) 616-4159 (Fax)
                                                  *Attorneys for United States of America*

OF COUNSEL:

ALLEN SCOTT BLACK
Assistant District Counsel
Memphis District
U.S. Army, Corps of Engineers
167 N. Main Street, Rm. B-202
Memphis, TN 38103
allen.s.black@usace.army.mil
(901)544-3662
(901)544-3336 (Fax)

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 4, 2014, a true copy of the foregoing United States' Proposed Findings of Fact and Conclusions of Law was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record, by operation of the Court's electronic filing system.

/s/  Stephen M. Ketyer
STEPHEN M. KETYER
Trial Attorney – U.S. Department of Justice