UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

CHAD BLANCHARD                                    CIVIL ACTION NO. 12-3140

VERSUS                                            JUDGE DOHERTY

THE UNITED STATES OF AMERICA                      MAGISTRATE JUDGE HANNA
THROUGH ITS AGENCY THE UNITED
STATES ARMY CORPS OF ENGINEERS

---

### COMPLAINANT, CHAD BLANCHARD'S, PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

NOW INTO COURT, through undersigned counsel, comes complainant, Chad Blanchard, who submits the following Proposed Findings of Fact and Conclusions of Law in advance of the November 12, 2013 bench trial.

I.    **PROPOSED FINDINGS OF FACT**

A.    **PARTIES AND ACCIDENT LOCATION**

1)    Complainant, Chad Blanchard, is a thirty-nine (39) year old white male, and a resident of Carencro, Louisiana.

2)    At the time of the incident, plaintiff was employed by and working for Stallion Oilfield Services, Ltd. ("Stallion"). Chad Blanchard's daily rate of pay at Stallion was $250 per day, at the time of the accident.

3)    Stallion is a foreign corporation, authorized to do and doing business in the State of Louisiana, and specifically within the Western District of Louisiana.

1

4)     On August 18, 2011, complainant, Chad Blanchard, had been sent by his employer, Stallion, to work as a deck hand aboard a two man tugboat named the M/V ALLURA, to which he was assigned at the time of the accident.

5)     The M/V ALLURA was owned and operated by Stallion at all times relevant hereto. The M/V ALLURA has an overall length of forty-five (45) feet and a beam of eighteen (18) feet.

6)     The United States of America, through its agency, The United States Army Corps of Engineers (hereinafter "USACE") is a governmental entity, and thus, this Honorable Court has original jurisdiction.

7)     At all times material, The United States of America, through its agency, The United States Army Corps of Engineers was the owner and operator of the M/V MISSISSIPPI. The M/V MISSISSIPPI is a 241foot long vessel which stands 52.5 feet tall, built in 1993 and capable of carrying 36 crew members.

8)     At all times pertinent hereto, the M/V MISSISSIPPI was operating and conducting work on the navigable waters of the State of Louisiana, specifically, the Atchafalaya River.

9)     The parties stipulate that plaintiff, Chad Blanchard, has a Jones Act Seaman status, with a connection to the M/V ALLURA that was substantial in terms of both its nature and condition.

10)    This claim is properly brought before this Honorable Court pursuant to the Jones Act, 46 U.S.C.A. 30104, et. seq., and the General Maritime Law, 28 U.S.C.A. 1333, et. seq.

11)   Jurisdiction against the USACE is proper pursuant to the Public Vessels Act, 46 U.S.C.A. 31101-31113.

**B.    FACTS OF INCIDENT**

12)   On August 18, 2011, the M/V ALLURA, under the direction of Captain Harris Knott, was moored at the Hilcorp Lake Chicot dock, in the Atchafalaya River, Mile 84, in St. Martin Parish, Louisiana. Captain Knott, as master, placed the M/V ALLURA in the main channel of the Atchafalaya, where it remained exposed to passing boat traffic.

13)   After the M/V ALLURA was moored and immediately prior to the incident of August 18, 2011, Captain Knott departed the M/V ALLURA on a crewboat captained by Troy Simar. Plaintiff, Chad Blanchard, was left aboard the M/V ALLURA, without emergency help.

14)   On August 18, 2011, the M/V MISSISSIPPI was being operated by members of the USACE and was traveling the Atchafalaya River during a low water inspection tour.

15)   On August 18, 2011, the M/V MISSISSIPPI was being operated by members of the USACE and was traversing the Atchafalaya River at a high rate of speed, and throwing a large wake due to its unsafe speed. The M/V MISSISSIPPI was being captained by Captains Leo Hendrix and Cary Lewis who were rotating throughout pilot duties and tour guide duties. Specifically, during the M/V MISSISSIPPI's travels down the Atchafalaya, anywhere between four (4) and thirty (30) people were allowed to come and go freely from the wheel house and ask the captains specific questions regarding the river. At trial, Captain Cary Lewis testified that he would

3

gladly help answer any questions by the invitees aboard the M/V MISSISSIPPI at the same time he was attempting to act as a lookout from the wheel house.

16)   The Court specifically notes that the Inland Rules of the Road are clear that a lookout cannot have other duties while acting as the lookout. Based upon Captain Lewis' admission that he was entertaining and answering questions presented by anywhere from four (4) to thirty (30) people at a time in the wheel house, constitutes other duties and would certainly be a distraction. Indeed, maritime safety and vessel operations experts, Captain Ronald Campana and Dick Frenzel, confirm that the Inland Navigational Rules do not allow a person to act as both tour guide and lookout in the performance of his duties.

17)   M/V ALLURA captain, Harris Knott, and Troy Simar, left the M/V ALLURA to travel upriver towards Butte LaRose. As Captain Knott and Mr. Simar reached a distance of one-half to one mile upriver from the M/V ALLURA, they encountered the M/V MISSISSIPPI proceeding down river on its low water inspection.

18)   According to the testimony of Mr. Simar and Captain Knott, in encountering the M/V MISSISSIPPI, they moved their crew boat to the far east or right hand ascending bank in order to try and escape the wake being produced by the M/V MISSISSIPPI. Despite their move to the far right ascending bank, they encountered five (5) to six (6) foot swells which mandated they place their boat in neutral, and simply ride over the waves. The Court credits Mr. Simar and Captain Knott's testimony as unbiased and disinterested witnesses as to the size of the wake being produced by the M/V MISSISSIPPI.

19)   Stallion employee, Captain Harris Knott, testified that he knew immediately that the M/V MISSISSIPPI was throwing a large and dangerous wake which posed a threat

to the M/V ALLURA, which he moored in the main body of the Atchafalaya River. Despite the fact that he recognized the risks posed by the extremely large and dangerous wake, and that he recognized that the M/V ALLURA may be affected adversely by the wake, he made no attempts to contact plaintiff, Chad Blanchard, to warn or advise him of the impending danger.

20)  After the M/V MISSISSIPPI passed the small crew boat being captained by Troy Simar, it proceeded down river toward the position of the M/V ALLURA. According to the testimony of M/V MISSISSIPPI captain, Cary Lewis, approximately four (4) miles prior to encountering the M/V ALLURA, he picked up its AIS signature on his GPS. Captain Lewis recognized that the AIS signature was not moving, and either knew or should have known that it indicated a small commercial vessel moored inside the river.

21)  Despite the fact that the M/V MISSISSIPPI's captain, Cary Lewis, recognized the AIS signature of the M/V ALLURA, he made no move to slow the M/V MISSISSIPPI from its full throttle, 13.9 knot forward speed. Indeed, Captain Lewis testified that the top speed of the M/V MISSISSIPPI is approximately 15 to 16 mph, indicating that the M/V MISSISSIPPI was at top speed at the time Captain Lewis first identified the M/V ALLURA as an unmoving commercial vessel located in the main body of the river.

22)  Despite the fact that he noticed the AIS signature some four (4) miles prior to contact, Captain Lewis testified that he did reduce his forward speed or backed off from the throttles until he made visual contact with the M/V ALLURA approximately a mile to a mile and a quarter before coming abreast. Thus, despite

four (4) miles of warning of an approaching moored vessel, Captain Lewis and the M/V MISSISSIPPI took no action to reduce its full throttle forward speed until visual contact was made.

23)   Now armed with both visual and AIS identification of the M/V ALLURA, its moored status, and the size of the vessel, the M/V MISSISSIPPI only reduced her forward speed to approximately 11 mph, 3/4 of its maximum forward speed. The Court finds that the reduction of speed from full speed to 3/4 of maximum speed, is a violation of Rule 6 - Safe Speed, of the Inland Navigational Rules.

24)   Captain Lewis testified that he was aware that the wake produced by the M/V MISSISSIPPI posed a danger to a vessel the size of the M/V ALLURA at the time that he initially recognized the AIS signature of the M/V ALLURA. Despite this fact, he did nothing to reduce his forward speed until he had visual contact only a mile to a mile and a quarter from a direct encounter with the M/V ALLURA.

25)   Perhaps more importantly, despite the fact that Captain Lewis recognized that his wake posed a danger to the M/V ALLURA, and that he needed to reduce his speed, he engaged in a shift change with Captain Leo Hendrix prior to coming abreast of the M/V ALLURA. Thus, the captain that had recognized the danger, and was in the best position to appreciate the affect his wake may have, left the helm to another captain. Captain Lewis neither posted a lookout to determine the affects of his wake on the bank, the M/V ALLURA, or make a determination of whether his wake adversely affected the M/V ALLURA.

26)   At the time the M/V MISSISSIPPI and its wake were affecting the M/V ALLURA, plaintiff, Chad Blanchard, was attempting to descend an internal stairwell into the engine room in the performance of his duties aboard the M/V ALLURA. As Mr. Blanchard turned backwards into order to descend the ladder/stairway facing inward, the M/V ALLURA was impacted by several large and dangerous wakes thrown by the M/V MISSISSIPPI. As a result, he lost his footing and fell down the stairs severely injuring his shoulder, elbow, back, and impacting his nether regions.

27)   The Court was provided with the testimony from plaintiff's expert, Captain Richard Frenzel, a licensed master with fifty (50) years of experience in the marine industry. Captain Frenzel is recognized and accepted as an expert in marine safety and navigation, as he possesses specialized training in the areas of marine accident reconstruction, and vessel operation.

28)   According to plaintiff's expert, Captain Richard Frenzel, the failure of Captain Cary Lewis to reduce his speed below 11 mph, did not give time for the wake to appreciably diminish in the time it took to reach the M/V ALLURA. Thus, Captain Frenzel finds that Captain Lewis and the M/V MISSISSIPPI were negligent in failing to reduce its speed sufficient to "properly break" his wake prior to passing the M/V ALLURA.

29)   Indeed, the testimony of Captain Cary Lewis confirms the opinions of Captain Richard Frenzel, by acknowledging that the reduction in throttle applied to the M/V MISSISSIPPI as it approached the M/V ALLURA would take approximately four (4) to five (5) minutes before the wake and speed would appreciably diminish. Captain

Lewis also testified that he knew M/V MISSISSIPPI threw a large wake but was unable to quantify the vessel despite the fact that he knew it would upset smaller tugs and tows in the river.

30)     Likewise, the Court was presented the testimony of Captain Ronald Campana, a maritime safety and vessel operations expert retained by Stallion Offshore. In accepting Captain Campana as an expert in the fields of marine safety and vessel operation, the Court was provided testimony that the M/V MISSISSIPPI was navigating in an unsafe manner with no regard to the safety or welfare of the smaller vessels, such as the M/V ALLURA, along the Atchafalaya River.

31)     The Court accepts the opinions and testimony of Captain Campana and finds that Captain Lewis' failure to begin his reduction of speed upon immediately noticing the M/V ALLURA, was a violation of Rule 6 of the Inland Navigational Rules and the primary cause of the accident complained of. Specifically, the Court finds, that but for the failure of the U.S. Corps of Engineers, and its employees to navigate the Atchafalaya River at a safe speed, and be on proper lookout for other vessels, this accident would not have occurred.

### C.     MEDICAL TREATMENT AND CAUSATION

32)     Following the accident Dr. Gregory Gidman, an orthopedist, examined Mr. Blanchard for sharp pain and a poking sensation deep in the right shoulder area, as well as pain in the neck and lower back. X-rays were taken of the right shoulder, neck and lower back.  Dr. Gidman rendered an assessment of 1) neck strain, 2) right shoulder strain, and 3) lumbar strain. Dr. Gidman recommended a home therapy

program. Mr. Blanchard's right arm was placed in a sling. Dr. Gidman permitted Mr.

Blanchard to resume regular work activities at a slower work pace using the sling.

33)    Mr. Blanchard returned for othopedic follow-up on August 23, 2011, with complaints

concerning the cervical spine, lumbar spine and right shoulder. Dr. Gidman ordered

imaging studies and instructed Mr. Blanchard to continue with home therapy. Dr.

Gidman dispensed Lortab 10/500 mg for pain. Mr. Blanchard was also seen on

August 25, 2011 for neck pain, lower back pain and right shoulder pain. Dr. Gidman

noted that Mr. Blanchard is unable to work and referred him to a formal outpatient

physical therapy program. Mr. Blanchard was prescribed Ambien for sleep and

Vicodin for pain.

34)    Imaging studies of the cervical spine, lumbar spine and right shoulder were

accomplished on August 29, 2011. The MRI of the cervical spine was unremarkable.

The MRI of the right shoulder revealed 1) minor osteoarthritis of the AC joint

creating rotator cuff impingement, 2) thinning of the cuff indicating degeneration, but

no evidence of a full-thickness tear, and 3) superior labral tear extending into the

anterior labrum. The MRI of the lumbar spine revealed 1) L2-L3 desiccation,

otherwise negative, 2) L4-L5 desiccation and minimal disc bulge, no nerve root

displacement, and 3) L5-S1 minimal central disc herniation with no nerve root

pathology. S1 is transitional.

35)    Dr. Gidman reevaluated Mr. Blanchard on September 1, 2011. Mr. Blanchard

reported that his shoulder was feeling better but he still had some pain in the axilla.

During this clinic visit Mr. Blanchard also complained of lower back pain. Dr.

Gidman discussed the results of the imaging studies and recommended a formal physical therapy program, as well as a referral to Dr. Fenn for the SLAP lesion.

36) Records reveal that Dr. Fenn examined Mr. Blanchard on two occasions.  The initial examination was on October 7, 2011. Dr. Fenn recommended physical therapy that was denied, without cause by the employer, Stallion.

37) Dr. Louis Blanda, an orthopedist, examined Mr. Blanchard on November 1, 2011 for pain in the neck, right shoulder and back. A physical examination was conducted and a review of radiographs. Dr. Blanda recommended a course of physical therapy. Mr. Blanchard was prescribed Ultracet and Elavil HS. Again, PT was denied by plaintiff's Jones Act employer.

38) Mr. Blanchard was seen for orthopedic follow-up on December 13, 2011 for right shoulder, neck and back pain. A right shoulder arthrogram was ordered to confirm a rotator cuff tear. Mr. Blanchard was also referred for a lumbar epidural steroid injection for L4-L5, and L5-S1. Dr. Blanda also had Mr. Blanchard on a no work status. Plaintiff's employer denied PT, the injections, and refused to pay for Dr. Blanda's evaluation.

39) Dr. Blanda reexamined Mr. Blanchard on January 26, 2012. The right shoulder MRI arthrorogram was obtained on January 5, 2012 and was normal. During this clinic visit Mr. Blanchard reported back and left leg pain with mild weakness. Dr. Blanda recommended a home exercise program as a result of being unable to get approved for the injections and formal PT.

40) On April 3, 2012 Mr. Blanchard was seen for follow-up regarding his right shoulder and lower back pain. Dr. Blanda refilled Mr. Blanchard's medications of Soma and Lortab and prescribed another regimen of outpatient physical therapy, which was again denied without cause.

41) Mr. Blanchard was seen for orthopedic follow-up on July 19, 2012. He continued to be symptomatic in the back and right shoulder. Dr. Blanda ordered a MRI of the lumbar spine and EMG/NCV studies. Mr. Blanchard was on a no work status.

42) Dr. Blanda reevaluated Mr. Blanchard on August 23, 2012. A MRI of the lumbar spine and EMG/NCV studies were ordered but there had been no authorization from worker's compensation. Mr. Blanchard continued to remain symptomatic. Dr. Blanda refilled his medications. Mr. Blanchard was on a no work status.

43) On October 18, 2012, Mr. Blanchard presented for orthopedic follow-up. During this clinic visit Mr. Blanchard complained of lower back pain, right shoulder pain and right hand pain with little finger and ring finger numbness. EMG/NCV studies were ordered.

44) On November 20, 2012 Mr. Blanchard underwent EMG/NCV studies of the right upper extremity. These studies revealed borderline right ulnar nerve entrapment neuropathy at a level of the cubital tunnel.

45) On December 13, 2012, Dr. Gidman performed an Independent Medical Examination ("IME") of Mr. Blanchard. Dr. Gidman examined Mr. Blanchard and rendered an assessment of 1) neck strain, 2) right shoulder strain, and 3) Lumbar strain. At this IME, Dr. Gidman stated that Mr. Blanchard was at MMI for his cervical spine, but

he diagnosed Mr. Blanchard with chronic lower back pain with a three percent (3%) whole body impairment. In regard to the cervical and lumbar spine, Dr. Gidman recommended a good home therapy program and noted that surgical intervention is not necessary. Concerning the right shoulder, Dr. Gidman suggested a repeat MRI of the right shoulder. If a SLAP lesion is present in the labrum, then an arthroscopy of the right shoulder would be and reasonable, and the patient would not be at MMI. A functional capacity evaluation and vocational rehabilitation services were also recommended.

46)   Dr. Blanda reevaluated Mr. Blanchard on January 31, 2013. The results of the EMG/NCV studies were discussed. Dr. Blanda rendered diagnoses of 1) herniated lumbar disc and 2) ulnar neuropathy. Mr. Blanchard was on a no work status. Dr. Blanda ordered a TENS and outpatient physical therapy.

47)   On February 11, 2013, Mr. Blanchard presented to Moreau Physical Therapy for his diagnosis of cervical pain, shoulder pain, and lumbar pain. On this visit, Mr. Blanchard's pain level was a 7 out of 10 and he also reported having headaches one to two (2) times per week. The assessment of Anthony Marino, III of Mr. Blanchard's injuries was consistent with the diagnosis of Dr. Blanda. Thereafter, Mr. Blanchard was set up to be seen by the Moreau Clinic three (3) times per week for four (4) weeks.

48)   Mr. Blanchard returned to the orthopedic clinic on March 28, 2013. During this clinic visit Mr. Blanchard reported persistent pain in the lower back. He was attending physical therapy and it has been causing testicle region pain. Dr. Blanda discussed

treatment options, injections versus surgery. Mr. Blanchard stated that he would consider surgery. Dr. Blanda discussed that Mr. Blanchard will probably need a minium  L5-S1 microdiscectomy and right ulnar nerve transposition at the elbow. Mr. Blanchard is on a no work status.

49)     On July 9, 2013 Mr. Blanchard was seen for orthopedic follow-up. On examination Mr. Blanchard had decreased sensation in the right ulnar nerve distribution with a positive Tinel's in the right elbow at the medial epicondyle. Dr. Blanda ordered an updated MRI. Mr. Blanchard was on a no work status.

50)     Dr. Gidman examined Mr. Blanchard on July 11, 2013 and rendered an assessment of 1) low back pain and 2) tardy ulnar nerve of the right arm. Dr. Gidman opined that Mr. Blanchard had reached maximum medical improvement concerning the right shoulder and only needs symptomatic treatment. Dr. Gidman concurred with Dr. Blanda's diagnosis of a tardy ulnar nerve of the right arm, and recommended an electrical study of the right upper extremity. Dr. Gidman also concurred with Dr. Blanda's surgical recommendation for the ulnar nerve palsy and the performance of a series of three lumbar epidural steroid injections.

51)     On July 20, 2013, Mr. Blanchard underwent a lumbar epidural steroid injection with Dr. Steven Staires.

52)     On July 22, 2013 an updated MRI of the lumbar spine was taken. This study showed mild L4-L5 and L5-S1 degenerative disc disease.

53)     On September 5, 2013 Mr. Blanchard underwent a lumbar epidural steroid injection.

54)     On October 14, 2013, Mr. Blanchard then presented to Dr. Daniel Hodges with the Physical Medicine and Rehabilitation section of Lafayette Bone and Joint Clinic. Mr.

Blanchard's complaints on that date of visit included neck pain and back pain which radiates into his right leg. Mr. Blanchard described his pain as a stabbing type pain at this visit. Mr. Blanchard's pain level was a 5 out of 10. At this visit, Dr. Hodges took three (3) views of Mr. Blanchard's cervical spine which revealed degenerative changes at C4-5 and C5-6 with some narrowing at C4-5 and C5-6 with changes in the normal lordosis. Dr. Hodges also changed Mr. Blanchard's lower back pain medications.

55)   On February 3, 2014, Mr. Blanchard presented to Louisiana Surgical Specialty Hospital where Dr. Blanda performed an ulnar nerve decompression and anterior transposition at the right elbow. Following said surgery, Dr. Sanjiv Jindia performed an axillary nerve block for the purpose of post-operative pain relief in the right arm.

56)   On February 18, 2014, Mr. Blanchard returned for a follow-up visit with Dr. Blanda. At this visit, the suture loops from the right arm surgery were removed and the patient reported he was having some problems with swelling in his fingers. Dr. Blanda thereafter ordered physical therapy evaluation and treatment for three (3) times a week for four (4) weeks. Dr. Blanda also instructed the client to perform exercises at home to improve his condition and to follow-up with his office.

57)   On March 1, 2014, Mr. Blanchard followed up with Dr. Blanda at the Lafayette Bone and Joint Clinic. At this visit, Mr. Blanchard's sensation and strength was improving in his right arm, however, his back and leg pain were becoming painful again. Upon examination, Mr. Blanchard was positive for spasms as well as straight leg raising tests on the right at 60 degrees. At this visit, Dr. Blanda recommended a third lumbar epidural steroid injection with Dr. Staires.

58)    On April 29, 2014, Mr. Blanchard returned to Lafayette Surgical Specialty Hospital for his third lumbar epidural steroid injection at L5-S1.

59)    Dr. Gregory Gidman was asked to perform a repeat independent medical examination to determine Mr. Blanchard's work status and residual restrictions on May 7, 2014. On this date, Dr. Gidman again concurred with the reasonableness of Dr. Blanda's ulnar nerve surgery and the performance of epidural steroid injections. While Dr. Gidman did not think any additional epidural steroid injections would be warranted, he did advise that Mr. Blanchard was on a light-duty work restriction for the next nine (9) to twelve (12) months, and thereafter, should be evaluated by FCE. Importantly, Dr. Gidman offered no adverse opinion regarding medical causation, or refuted the necessity of the medical procedures being performed by Dr. Blanda.

60)    On May 15, 2014, Mr. Blanchard returned to Dr. Blanda's office for a follow-up visit. At this visit, Dr. Blanda noted that following the three (3) lumbar epidural steroid injections with Dr. Staires, Mr. Blanchard has had excellent results from those injections. Dr. Blanda reported that Mr. Blanchard continues to complain of some occasional right elbow pain. Dr. Blanda advised Mr. Blanchard to start walking briskly for exercise and he recommended light to medium dumbbell lifting. Mr. Blanchard remains on no work status.

61)    Dr. Blanda's trial testimony was presented to this Court. The Court took note that Dr. Blanda is the treating physician, and his opinions are entitled to greater weight as the treating physician. In his deposition, Dr. Blanda specifically related the injuries to Mr. Blanchard's neck, back, shoulder, and elbow to the accident of August 18, 2011. As a result of Dr. Gidman's concurrence, Dr. Blanda's opinions remained unrefuted.

62)     According to Dr. Blanda's trial testimony, Mr. Blanchard is currently at light-duty work status, and is unable to return to his former occupation. Due to the injuries to his lumbar spine and elbow, Dr. Blanda has advised that he would extend the light-duty restriction for a period of one year from the date of trial, and thereafter, consider an elevation to light to medium duty. Dr. Blanda opined that a restriction to light to medium duty was permanent in duration. Again, there is no adverse medical opinion regarding these restrictions.

63)     The Court finds that the neck, elbow shoulder, and back injury was causally related by the incident which occurred on August 18, 2011.

64)     The Court finds that the treatment of Dr. Blanda, both past treatment and future recommended treatment in the form of conservative treatment and surgical intervention, to be reasonable, medically necessary and directly related to the events of August 18, 2011.

65)     The Court additionally finds that the restrictions imposed by Dr. Blanda are reasonable, indicating that Mr. Blanchard has a permanent restriction to light to medium duty which prevents his return to his occupation as a deck hand or captain.

**D.    PAST AND FUTURE MEDICAL COSTS**

66)     As of April, 2014, all past medical expenses related to complainant's treatment for his injuries total $42,794.44.

67)     As of May 27, 2014, Stallion has paid Cure benefits amounting to $42,794.44.

68)     With respect to future medical costs, the Court accepts the testimony of Dr. Blanda and Dr. Gidman, the IME doctor, that Mr. Blanchard will continue to need conservative treatment in the future. Specifically, Dr. Blanda testified that Mr.

Blanchard will need periodic office visits with some prescription medications, as well as some physical therapy for the next 2 years. Dr. Blanda further testified that Mr. Blanchard is now limited to light to medium duty permanently, with the hope that he may be able to move up to medium duty at some point in the future. The estimated future medical costs associated with this treatment will be $10,000.

### E.    ECONOMIC LOSS

69)    The plaintiff can recover those elements of economic damages that he can prove with reasonable certainty. The burden of proof is upon the party claiming damage to prove that he has suffered damage and to prove the elements thereof with reasonable certainty. *Peters v. Lines*, 275 F.2d 919, 930 (9th Cir. 1960).

70)    Any claim by a plaintiff for lost wages, medical expenses, and impaired future earning capacity must be supported by concrete evidence not merely an optimistic forecast of loss divorced from plaintiff's past history, substantiated by the facts. *Fleming v. American Export Isbrandtsen Lines, Inc.*, 318 F. Supp 194 (S.D.N.Y. 1970), affirmed at 451 F. 2d 1329 (2nd Cir. 1971).

71)    An award for loss of future earnings must be based on actual proof of the amount of impairment and not mere conjecture. *Oregon-Washington R.R. and Nav. Company v. Branham*, 259 F. 555, 557(9th Cir. 1919); *Firth v. United States*, 554 F. 2d 990 (9th Cir. 1977).

72)    The base figure used to calculate future wage loss is the difference between what a person earned before the accident and what he would be able to earn upon returning to work, not necessarily in the same job.

73)     An award for lost income, both past and future, is discounted to reflect lost wage income after both state and federal taxes have been deducted. *Jones V. Laughlin Steel Corporation v. Pfeifer*, 462 U.S. 523, 536, 103 S. Ct. 2541, 76 L. Ed. 768 (1983). Similarly, any award for future benefits, including future lost wages, and future medical care, if any, must be discounted to present value. *Id*. at 538; *Alma v. Manufactures Hanover Trust Company,* 684 F. 2d 622, 626 (9th Cir. 1982).

74)     Loss, decrease, or impairment of earning capacity or power, consequent to a personal injury, is a proper element of damages. "Earning capacity" means the potential for earning money in the future but is not necessarily based upon the amount of money being earned at the time of injury. The purpose of an award of damage is to compensate for loss of earning capacity as distinguished from actual loss of earnings. *Jones Id.*; *U.S. v. Jacobs*, 308 F. 2d 906, 907 (5th Cir. 1952). Previous wages earned by a plaintiff do not put a cap on an award of lost future wages. *O'Shea v. Riverway Towing Company*, 677 F.2d 1194, 1198 (7th Cir. 1982); *Barnhart v. American Oil Company*, 237 F. Supp. 492, 501 (E.D. Va. 1965).

75)     It is assumed that if the injured plaintiff had not been disabled, he would have continued to work and to receive wages until the time, disability or death. An award for loss of earning capacity is intended to compensate the worker for the loss of that stream of income. *Laughlin Steel*, *supra* at 533.  In determining damages resulting from the loss of impairment of earning capacity the court must look to the life expectancy at the time of the injury; the award must be based on a probable pecuniary loss reduced to its present net worth. *Pfifer v. Jones and Laughlin Steel Corp.*, 678

F.2d 453, 460 (3rd Cir. 1982); *Downie v. U.S. Lines Company*, 359 F. 2d 344, 347 (3rd Cir. 1966).

76) Another recoverable element of damages under the Jones Act are the costs of the household services that Mr. Blanchard will now incur as a result of his accident related injuries. *Nelton v. Cenac Towing*, 2011 U.S. Dist. LEXIS 7129 (E.D. La. 2011).

77) The Court accepts the report of Ms. Stephanie Chalfin, a professional vocational rehabilitation counselor, who examined the complainant on September 5, 2013. At the time of her evaluation, Ms. Chalfin had been provided a detailed medical history, medical records, work history, earnings records and future medical recommendations with respect to complainant. These documents were used to create a vocational profile based upon past work experience and past earnings.

78) When considering the necessary information, Ms. Chalfin concluded that complainant's prognosis for re-employment is limited to the following jobs: motorcycle parts clerk, warehouse inventory specialist, vehicle check in clerk, and an a fuel clerk. These jobs had a median rate of pay of $8.30 per hour.

79) The Court also accepts the calculations provided by Dr. G. Randolph Rice, consulting economist. Based upon the conclusions of Ms. Chalfin and independent calculations, Dr. Rice put complainant's economic loss into two specific periods: Past Wage Losses and Future Wage Losses.

80) With respect to past wage losses prior to the date of trial, Dr. Rice calculates this figure to be $125,795.

81)    With respect to future wage losses, Dr. Rice calculated three separate scenarios. First, Dr. Rice puts a present value of Mr. Blanchard's future wage loss, if he returns to work in the capacity that he was pre-accident with Stallion, at a figure in the $935,288 - $1,384,605. Secondly, Dr. Rice puts a present value of Mr. Blanchard's future wage losses, if he was able to complete the process of re-instating his captain's license at a figure in the $1,100,539 - $1,633,078 range. Thirdly, Dr. Rice puts a present value of Mr. Blanchard's future wage loss, if he returns to work in the capacity that was identified by Ms. Chalfin, at a figure in the $642,758  - $808,009 range.

82)    The Court accepts in its entirety the opinions and testimony of Dr. Rice, and hereby finds that plaintiff sustained post economic losses of $125,795 as a direct result of the incident of August 18, 2011 and his resulting injuries.

83)    The Court additionally finds the opinion of Dr. Rice on future wage to be convincing and awards future wage loss of $808,009.

## II.    CONCLUSIONS OF LAW

### A.    ADMIRALTY AND GENERAL MARITIME LAW

84)    The Court has jurisdiction of the remaining parties and subject matter pursuant to the General Maritime Law found in 28 USC § 1333, *et seq*.

85)    This matter has been properly designated for a bench trial pursuant to Federal Rule of Civil Procedure 9(h).

86)    Because these claims are within Admiralty Jurisdiction they are governed by a substance of admiralty law. *East River Corporation v. TransAmerica*, 476 US 858, 106 Supreme Court 2295 (1986); *Byrd v. Byrd*, 657 Fed 2d 615 (4th Cir. 1981).

87)   Pursuant to Admiralty and General Maritime Law, USACE and Stallion had a legal

duty to act reasonably under the circumstances.

**B.    LIABILITY**

88)   Under the Jones Act, a seaman's employer is liable for damages if the employer's

negligence caused the seaman's injury. *Gautreaux v. Scurlock Marine, Inc*., 107 F.3d

337 (5th Cir. 1997) (en banc). An employer is liable under the Jones Act if the

negligence played "any part, even the slightest" in causing the injury for which

damages are sought. *Id.* at 335 (citing *Rogers v. Missouri Pacific R. Co.,* 352 U.S.

500, 506, 77 S.Ct. 443, 1 L. Ed. 2d 493 (1957).

89)   The Fifth Circuit has observed a liberal causation requirement under the Jones Act

in that they place only a "featherweight" burden of causation on the plaintiff. *Landry*

*v. Two R. Drilling Co.*, 511 F.2d 138, 142 (5th Cir. 1975). If the defendant's

negligence played any part, however small, in producing the seaman's injury, it

results in liability. *Chisolm v. Sabine Towing & Transp. Co., Inc.,* 679 F.2d 60, 62

(5th Cir. 1982).

90)   The Jones Act is to be liberally construed in favor of seamen, and imposes only a

light burden on the plaintiff to prove causation. *Lamon v. Standard Oil Co.,* 117

F.Supp. 831, 834 (E.D. La. 1954), and *Sanders v. Diamond Offshore Drilling, Inc.,*

2006 U.S. Dist. Lexis 68509 (E.D. La. 2006).

91)   The Fifth Circuit has held that a vessel causing injury to others by her swell must be

held responsible for any failure to appreciate the reasonable effect of her own speed

and motion through the water at the particular place and under the particular

circumstances where the injury occurred, and her officers are required to take into

consideration others who may reasonably be expected to be affected, and to take all reasonable precautions to avoid their injury even though former experience has shown that in the ordinary and usual course of events they are likely to escape injury or that the larger vessel was proceeding on ordinary course and at her customary speed. *Creole Shipping, Ltd. v. Diamandis Pateras, Ltd.,* 410 F.Supp. 313, 316 (S.D. Ala. 1976), *aff'd* 554 F.2d 1348 (5th Cir. 1997); and *Moran v. The M/V Georgie May*, 164 F.Supp. 881 (S.D.Fla. 1958).

92)    A moving vessel owes a duty of reasonable care to appreciate the reasonable effect of its wake, and take adequate precautions to avoid creating unusual swells that may injure others. *Gregg v. Weeks Marine*, CIV. A. 99-1586, 2000 WL 798493 (E.D. La. June 21, 2000).

93)    Smaller craft have the right to assume larger craft aware of their presence will observe reasonable precautions and are under no duty to warn the larger vessel of the danger. *Moran v. The M/V Georgie May*, 164 F.Supp. 881 (S.D.Fla. 1958).

94)    A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suction which would damage craft properly moored or installations along the shoreline. *West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673 (5 Cir. 1951); *The Hendrick Hudson*, 163 F. 862 (S.D.N.Y.), *aff'd* 168 F. 1021 (2 Cir. 1909); *James Shewan & Sons v. New England Navigation Co.*, 155 F. 860 (E.D.N.Y.1907) *rev'd on other grounds* 169 F. 285 (2 Cir. 1909). *See also The Priscilla*, 15 F.2d 455 (S.D.N.Y.1926)**.**  Further, the moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way

of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage. *Moran v. The M/V Georgie May*, 164 F. Supp. 881 (S.D.Fla.1958); *Ferryboat Columbia*, 1937 A.M.C. 881 (E.D.N.Y.); *The Southern Cross*, 21 F.2d 75 (E.D.N.Y.), *aff'd* 21 F.2d 76 (2 Cir. 1927); *The Rotherfield*, 123 F. 460 (S.D.Ala.1903). *See also The Chester W. Chapin*, 155 F. 854 (E.D.N.Y.1907); *The Majestic*, 48 F. 730 (2 Cir. 1891).

95) The cases relied on by the court, *West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673 (5 Cir. 1951), and United States v. Ladd, 193 F.2d (4th Cir. 1952), were property damage cases, but as noted in *Moran*, *supra*, this is of no moment as personal injury is no less foreseeable than is property damage. *See also, Couch v. Bowman*, 263 F.Supp. 714 (E.D. Tenn. 1966).

96) Once libelant has established that swells or suction caused damage to its craft tied up at the shoreline, that such craft were properly moored to resist ordinary swell and suction normally to be anticipated, and that the swells came from the passing vessel charged with liability, the vessel which caused the swell is then required to exonerate itself from blame. In order to avoid liability she must show that it was not in her power to prevent the injury by any practical precautions she could have adopted. *West India Fruit & S.S. Co. v. Raymond, supra; Ferryboat Columbia, supra; The Rotherfield, supra*.

97) Initially, the Court reviews the Jones Act liability of plaintiff's employer, Stallion. In assessing the Jones Act liability of plaintiff's employer, the Court makes note that plaintiff has advanced three (3) arguments with regards to Stallion's liability. Initially, plaintiff argues that the M/V ALLURA was improperly moored within the

main body of the Atchafalaya where it would face exposure to the wakes of passing vessels. The Court makes note of the fact that there was a protected inlet where the M/V ALLURA had traveled multiple times throughout the day of the accident in order to deliver supplies and men to a work site. The Court finds that with the option available of a protective cove, that they had accessed multiple times throughout the day, the captain of the M/V ALLURA was negligent in failing to place the M/V ALLURA in the protected inlet where it would be safe from the wakes of large passing vessels. Secondly, the Court finds that plaintiff's second argument, that Mr. Blanchard was left alone aboard the vessel while it was moored, also constitutes Jones Act negligence on behalf of the captain. Finally, the Court finds Captain Knott's failure to radio plaintiff after encountering the M/V MISSISSIPPI to be negligent.

98) However, the Court finds the negligence of the United States of America to be more compelling in this instance. The Court was provided the testimony of Captains Frenzel and Campana regarding the effects of the wake being thrown by the M/V MISSISSIPPI as it proceeded down river on the date of accident. The Court was provided eyewitness testimony from Mr. Troy Simar and Captain Harris Knott, who both personally observed this vessel throwing a five (5) to six (6) foot wake. Likewise, plaintiff, Chad Blanchard, provided testimony that the wake being thrown by the M/V MISSISSIPPI was sufficient to clear the freeboard of the M/V ALLURA, and splash onto the deck. The Court finds the actual eyewitness testimony, and support from Captains Frenzel and Campana, compelling.

99)    The Court finds that USACE's actions were negligent in several respects. First, USACE's failure to properly operate/navigate their vessel, the M/V MISSISSIPPI, in order to avoid causing a dangerous swell and/or wake created an unreasonably dangerous condition. As noted above, the Court finds that this condition was a direct cause of Complainant's injuries. The defendant's negligence is most apparent when the Court weighs the low costs of slowing down the M/V MISSISSIPPI when its captain was aware of the location of the M/V ALLURA against the high risk of injury when it was creating such a substantial wake/swell. Based on the circumstances, the Court finds that the defendant knew or should have known that the large wake and/or swell was an unreasonably dangerous condition and it would impact the M/V ALLURA.

100)    The Court finds that USACE failed to comply with its duty[1] to take adequate precautions in navigating the Atchafalaya River at a safe speed to prevent damages from resulting from their excessive wake; and that USACE's actions fell below the standard of care.[2]

101)    The Court finds that USACE further violated a statutory duty by failing to keep a proper lookout and failing to proceed at a safe speed,[3] thus giving rise to the presumption, under *The Pennsylvania* Rule, that the statutory violations were the

---

[1] *See Creole Shipping, Ltd.  V. Diamandis Pateras, Ltd.*, 410 F.Supp. 313, 316 (S.D. Ala. 1976), aff'd 554 F.2d 1348 (5th Cir. 1997); and *Moran v. The M/V Georgie May*, 164 F.Supp. 881 (S.D.Fla. 1958) (finding that a vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred).  *See also Gregg v. Weeks Marine*, CIV. A. 99-1586, 2000 WL 798493 (E.D. La. June 21, 2000) ( A moving vessel owes a duty of reasonable care to appreciate the reasonable effect of its wake, and take adequate precautions to avoid creating unusual swells that may injure others).

[2] *United States v. Caroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947); *In re Signal Int'l LLC*, 579 F.3d 478 (5th Cir. 2009).

[3] Rule 5 and 6 of the 72 COLREGS, codified at 33 C.F.R. 83.05.

cause of Complainant's injury.[4] As a result of this presumption of causation, the burden is on USACE to show that its violations could not have been the cause of the injury to Complainant. Here, the probative evidence established that a proper lookout and proceeding at a safe speed when passing the M/V ALLURA would have prevented the excessive wake produced by the M/V MISSISSIPPI, and the subsequent fall and injuries sustained by the Complainant. Consequently, USACE has failed to carry the burden imposed by *The Pennsylvania* Rule, and the presumption of causation must stand.

102) Accordingly, the Court finds that the negligence of USACE was the proximate cause of the accident and injury which occurred on August 18, 2011.

103) The Court hereby assesses USACE with one hundred (100) percent fault for the events of August 18, 2011, and plaintiff's resulting injuries. The court also finds no comparative or contributory negligence on the part of Complainant.

## C.    UNSEAWORTHINESS

104) A shipowner has an absolute nondelegable duty to provide a seaworthy vessel. *Brister v. AWI, Inc.,* 946 F.2d 350, 355 (5th Cir. 1991). This duty is absolute and completely divorced from concepts of negligence. *Complaint of Merry Shipping, Inc.,* 650 F.2d 622 (5th Cir. 1981), *reh'g denied,* 659 F.2d 1079 (5th Cir. 1981). Therefore, a claim involving unseaworthiness is a species of strict liability. *Hall v.*

---

[4] The Fifth Circuit has established that the Pennsylvania Rule can be applied to personal injury maritime claims, such that where a vessel violates any statutory duty or rule of the road, to exculpate itself form liability, it must prove not only that the violation did not cause the accident, but could not have contributed to the accident. *See, e.g. United States v. Nassau Marine Corp.,* 778 F.2d 111 (5th Cir. 1985); *see also Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465 (5th Cir. 1991) (holding that the Pennsylvania Rule applies to marine casualties other than collisions, and stating that the rule has been "reformulated to apply to any 'statutory violator' who is a 'party to a maritime accident.') (*citing Sheridan Transp. Co v. United States,* 834 F.2d 467, 476 (5th Cir. 1987) (Sheridan I) appeal after remand, 897 F.2d 795, 799 (5th Cir. 1990)(Sheridan II)); and Reyes v. Vantage S.S. Co., 559 F.2d 538 (5th Cir. 1977).

*American S.S.*, 688 F.2d 1062, 1066 (6th Cir. 1982).

105)    A seaworthy vessel is one where the vessel, its crew, appurtenances, equipment and operation are reasonably fit for the vessel's intended purpose.  Accordingly, to prove a vessel is unseaworthy, a plaintiff must prove that the defendant provided a vessel (including its appurtenances, gear and equipment) that was not reasonably fit for its intended purpose. *Phillips v. Western Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992).

106)    The plaintiff must show that the unseaworthy condition played a substantial part in plaintiff's injury, and that the injury was either a direct result or a reasonably probable consequence f the vessel's unseaworthiness. *Phillips v. Western Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992).

107)    The Court finds that for the M/V ALLURA to be properly manned and fit for its intended use, the vessel must be outfitted with a two man crew, one of which must be a qualified USCG Licensed Master at all times relevant.

108)    The Court finds that Captain Knott's decision to depart the M/V ALLURA on August 18, 2011, and leave only one crew member, who was not a qualified USCG Licensed Master, aboard the vessel while it was moored at the Hilcorp Lake Chicot dock, in the Atchafalaya River, created an unseaworthy condition. Further, the high risks associated with an improperly manned vessel and without sufficient crew to assist complainant, Chad Blanchard, in the performance of his duties aboard the M/V ALLURA greatly outweighs the low costs of Captain Knott remaining on the vessel.

109)    The Court further finds that an unseaworthy condition existed when Plaintiff, Chad Blanchard, was left aboard the M/V ALLURA, without emergency help.

110) Considering the expert testimony provided, the Court also finds that Stallion and/or Captain Knott violated Rule 5 of the USCG Inland Steering and Sailing Rules when Chad Blanchard was left aboard the M/V ALLURA alone with out a proper lookout to be able to take effective action regarding any potential hazards.

111) Considering the expert testimony provided, the Court also finds that the mooring technique and positioning of the  M/V ALLURA at the time of the incident was improper and allowed said vessel to be impacted by the incoming wakes from passing boat traffic and subjecting complainant, Chad Blanchard, to injury.

112) The Court finds that the Stallion employee, Captain Harris Knott, was negligent when he knew that the M/V MISSISSIPPI was throwing a large and dangerous wake which posed a threat to the M/V ALLURA, which he moored in the main body of the Atchafalaya River and he made no attempts to contact plaintiff, Chad Blanchard, to warn or advise him of the impending danger.

113) Because Mr. Blanchard's injuries were caused in part by an unseaworthy condition aboard the M/V ALLURA, the Defendant, Stallion, is liable in part for the damages he sustained.

**D.   FAILURE TO PAY MAINTENANCE AND CURE**

114) Aside from the liability arguments advanced by plaintiff, plaintiff also makes claims for compensatory and punitive damages arising out of his employer, Stallion's, failure to pay maintenance and cure.

115) A seaman injured in the service of the ship is entitled to recover maintenance and cure benefits from his employer or the ship owner, until the time of maximum cure. See *Hall v. Noble Drilling, Inc.,* 242 F.3d 582, 586 (5th Cir. 2001). Recovery for

maintenance and cure is available to any seaman who is injured while the service of his ship and the seaman's own negligence, if any, will not bar recovery. See *Vaughn v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L. Ed. 2d 88 (1962). A ship owner's duty to pay maintenance and cure is virtually automatic. Indeed, maintenance and cure is the implied right of a seaman arising from his employment relationship with the ship owner, and is independent of any other source of recovery for the seaman. See *Bertram v. Freeport Backmeran,* 35 F.3d 1008, 1012 (5th Cir. 1994).

116)  The general maritime law has recognized for more than a century the duty of maintenance and cure and the general availability of punitive damages for a failure to pay same. See *Atlantic Sounding v. Townsend,* 557 U.S. 404 (2009). In addition to punitive damages, the Court may award compensatory damages for failing to pay maintenance and cure that does not arise to a punitive nature.

117)  The Court finds that Stallion, as plaintiff's Jones Act employer, had the duty to provide maintenance and cure benefits, which were unreasonably denied for a period of more than one year despite the undisputed facts of the accident. The Court finds that as a result of Stallion's failure to pay maintenance and cure, Mr. Blanchard's medical treatment and ultimate release to some type of work duty was delayed by more than one year. The Court finds that the delay, was without reasonable cause, and rises to the level necessary to award compensatory and punitive damages as a result of Stallion's failure to pay. As such, the Court awards Mr. Blanchard $25,000 in compensatory damages and $25,000 in punitive damages for failure to pay maintenance and cure, or a termination of same without reasonable cause.

118)     The Court further finds that Mr. Blanchard has satisfied his featherweight burden of causation with regards to his neck, shoulder, elbow, and lower back injuries. Mr. Blanchard was confirmed to be in good health by Stallion prior to his hiring. Following the accident, Mr. Blanchard suffered with injuries that ultimately required surgery, and invasive medical treatment. Considering the facts and testimony of the medical experts, the Court finds that Mr. Blanchard has satisfied his burden under the Jones Act, entitling him to an award of damages against his Jones Act employer, Stallion. These damages to include compensatory damages for the Jones Act negligence, as well as the award of maintenance and cure, with punitive and compensatory damages for the failure to pay same.

**E.     GENERAL DAMAGES**

119)     The Court finds that plaintiff sustained serious injuries to his neck, shoulder and back as a direct result of the incident of August 18, 2011. Plaintiff further continues to suffer from chronic pain in his lower back and shoulder with problems as a result of these events.

120)     The evidence presented by both plaintiff and his treating physicians confirms the difficulties in daily living, the loss of enjoyment of life, physical pain and suffering, and mental and emotional anguish, as a direct result of the August 18, 2011 incident.

121)     The Court feels that due to the injuries suffered, and their prolonged and lasting impact upon plaintiff, he should be awarded $250,000 in general damages for his past and future physical and mental pain and suffering and disability.  This award is in line with awards made in Jones Act Cases by both the United States District Courts and Louisiana State Courts.

F.    **INTEREST**

122)    The court finds that it is authorized to award pre-judgment interest, upon recovery of any monetary damages, as this matter arises under the court's admiralty jurisdiction. 28 USC §1961.

123)    In this circuit, there is a strong presumption in favor of awarding pre-judgment interest, and will usually only be denied in cases where the plaintiff exercised undue delay in bringing his action. The court further finds that the plaintiff did not unreasonably delay in bringing the suit.  Thus, the Court finds that plaintiff is entitled to pre-judgment interest on all monetary sums awarded. *US v. Ocean Bulk Ships Inc.*, 248 F. 3rd 331 (5th Cir. 2001); *Daigle v. L&L Marine Transport Company*, 322 F. Supp. 2nd 717 (E.D. La.).

124)    The Court finds that pre-judgment interest on damages shall be awarded from the day of loss in this matter, July 28, 2010, at a rate of 7 percent per annum. *Reeled Tubing Co. Inc. v. M/V Chad G*, 794 Fd 2d 1026 (5th Cir. 1986).

Respectfully submitted:


BY: */s/ Jason M. Welborn*_____
        JOSEPH F. GAAR, JR. # 16927
        JASON M. WELBORN # 26548
        WILLARD P. SCHIEFFLER # 25862
        LUCAS S. COLLIGAN #31671
        JACOB H. HARGETT #32490
        Attorneys At Law
        617 S. Buchanan Street (70501)
        Post Office Drawer 2069
        Lafayette, LA 70502
        (337) 233-3185
        ATTORNEYS FOR PLAINTIFF,
        CHAD BLANCHARD

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 4, 2014, I presented the foregoing to the Clerk of Court

for filing and uploading to the CM/ECF system which will send notification of such filing to all

known counsel of record.

*/s/ Jason M. Welborn*_____

JASON M. WELBORN
