UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION


CHAD BLANCHARD,                          :        Docket No. 12-3140
                                         :
                    Plaintiff,           :
vs.                                      :        June 20, 2014
                                         :
THE UNITED STATES OF AMERICA             :
THROUGH ITS AGENCY THE UNITED            :
STATES ARMY CORPS OF ENGINEERS,          :
                                         :
                    Defendant.           :        Lafayette, Louisiana
_____


REPORTER'S OFFICIAL TRANSCRIPT OF THE FINDINGS OF FACT

AND CONCLUSIONS OF LAW GIVEN DURING THE BENCH TRIAL

BY THE HONORABLE PATRICK J. HANNA

UNITED STATES MAGISTRATE JUDGE


LARAE E. BOURQUE, RMR, CRR
Federal Official Court Reporter
800 Lafayette Street, Ste. 3103
Lafayette, LA  70501

A P P E A R A N C E S

FOR THE PLAINTIFF:

                                        JASON M. WELBORN
                                        JACOB H. HARGETT
                                        Law Office of Joseph F. Gaar, Jr.
                                        P.O. Box 2053
                                        Lafayette, LA  70502-2053

FOR THE U.S. ARMY CORPS OF ENGINEERS:

                                        STEPHEN M. KETYER
                                        EDMUND M. FERGUSON
                                        U.S. Department of Justice
                                        P.O. Box 14271
                                        Washington, D.C.  20044-4271

                                        JENNIFER B. FREDERICK
                                        U.S. Attorney's Office
                                        800 Lafayette St., Ste. 2200
                                        Lafayette, LA  70501

FOR STALLION OILFIELD SERVICES, LTD.:

                                        SCOTT A. SOULE
                                        Blue Williams
                                        1060 W. Causeway Approach, Ste. 1
                                        Mandeville, LA  70471

```
1              P R O C E E D I N G S

2                             (Call to order of the court.)

3          THE COURT:  Good afternoon.  Please be seated.

4          All right.  This is Chad Blanchard vs. United States,

5   et al., Civil 12-3140.  After three days of trial, the Court is

6   prepared to issue its ruling.

7          May I have appearances, please.

8          MR. WELBORN:  Jason Welborn and Jacob Hargett on behalf

9   of the plaintiff, Chad Blanchard.

10          MR. SOULE:  Scott Soule on behalf of Stallion.

11          MR. KETYER:  Steven Ketyer and Jennifer Frederick on

12   behalf of the United States of America, and Ed Ferguson.

13          THE COURT:  Thank you.

14          Okay.  This case comes before this Court for

15   disposition pursuant to 28 U.S.C. § 636(c)(1) on the consent of

16   the parties.

17          Jurisdiction is proper before this Court pursuant to

18   the Jones Act, 46 U.S.C. 30104, et seq., the General Maritime

19   Law, 28 U.S.C. § 1333.  In addition, jurisdiction against the

20   U.S. Army Corps of Engineers is proper pursuant to the

21   Public Vessels Act, 46 U.S.C. 31101-31113.

22          Pursuant to Federal Rule of Civil Procedure 52(a), this

23   Court is charged with separately finding its facts from its

24   conclusions of law which may be stated on the record at the close

25   of the evidence.  The following constitutes this Court's findings
```

1    of fact and conclusions of law.

2         To the extent that any conclusion of law is deemed to

3    be a finding of fact, it is adopted as such; and likewise, any

4    finding of fact that is deemed to be a conclusion of law is so

5    adopted.

6         The following are the stipulations of the parties:  The

7    plaintiff was a Jones Act seaman at all times pertinent.  The

8    M/V ALLURA was owned by Stallion at the time of the accident.

9    The defendant, Stallion, was the employer of Chad Blanchard.  The

10   M/V MISSISSIPPI was owned and operated by the U.S. Army Corps of

11   Engineers.  The Army Corps Atchafalaya Navigation Map Number 23

12   from 2007 was in effect on the date of the accident.  Between

13   August 1, 2012, and January 21, 2013, the plaintiff did not

14   receive maintenance and cure following a change in carriers.  On

15   January 22, 2013, plaintiff was reimbursed $8,096 for total

16   maintenance during that time period at $44 per day.  Plaintiff

17   had been receiving medical treatment during that time.  And on

18   January 31, 2013, Jason Welborn, Andre Toce, and Scott Iles were

19   reimbursed for cure owed at a total of $4,375.16.  The amount of

20   the crossclaim of Stallion for maintenance and cure paid is

21   $104,550.36.

22         All right.  These are the Court's findings of fact in

23   addition to those stipulations.

24         The plaintiff is a 39-year-old white male who was

25   working for Stallion Oilfield Services, Ltd., hereinafter

Stallion, as a contract hand on various vessels, all of which were owned, operated, or otherwise under the common control of Stallion.  His daily rate of pay at Stallion at the time of the accident was $160 per day as he was working as a deckhand. However, the majority of the time he worked as an unlicensed vessel captain at a rate of $250 per day.  The plaintiff worked 76 days total with Stallion, and of those, 47 days were at a captain's rate and 29 days were at a deckhand's rate.  Stallion does not contest its status as the borrowing Jones Act employer of the plaintiff.

On August 18, 2011, the date of the accident at issue, the plaintiff was assigned to work as a deckhand aboard a two-man pushboat named the M/V ALLURA.  The captain on that date was Harris Knott who was an employee of Stallion.

According to the vessel certificate issued by the United States Coast Guard, the ALLURA has a length of approximately 41 feet, a beam of 18 feet, and a depth of 6.6 feet.  Although the evidence showed that at the time of an inspection, the freeboard was 21 inches, resulting in a draft of just under 5 feet, that figure could change depending on such variables as the amount of fuel or water, et cetera.

During the period just before and up to August 18, 2011, the ALLURA was working in conjunction with a pipeline construction project at the Hilcorp Lake Chicot facility at approximately Mile Marker 85.7.  A shallow inlet existed

downstream of the Hilcorp Lake Chicot dock, and the ALLURA had traveled the inlet on days prior to the accident and had docked for the night in the inlet on previous dates.  However, on the date of the accident, Captain Knott, who was leaving the vessel at the end of the workday, determined he could not safely moor the vessel in the inlet overnight due to the shallow water and falling river conditions as well as poor cellular coverage.

The Atchafalaya River was in a low water stage with the nearest measured depth at the Butte La Rose river gauge to be 6.18 feet and falling.  Flood stage for the Atchafalaya at Butte La Rose is 25 feet.

Therefore, Captain Knott decided to moor the ALLURA at the docking facility in the Atchafalaya River itself.  At the time of the accident it was moored with a two part line on the bow and stern in an undetermined depth of water.  The plaintiff made fast the moorings and there is no evidence that the ALLURA was improperly moored.

Although the plaintiff was left alone on the ALLURA for the night, there was no work being performed by the vessel.  The plaintiff was an experienced deckhand who had once held a master's license that he was working toward trying to regain after a period of self-surrender of his credentials due to a controlled substance violation.  Captain Knott had instructed the plaintiff to call on his cell phone if any problems arose.

The United States, through its agency, the Army Corps

of Engineers, was the owner and operator of the M/V MISSISSIPPI.
According to its vessel specifications, it is a triple-screw
towboat with a length of 241 feet, a beam of 58 feet, a height of
52 feet, a draft of 8 to 9 feet from the waterline to the keel,
with a depth of 12 feet and a displacement of 2,135 tons.  It is
powered by three Caterpillar diesel engines producing
6,276 horsepower with three five-blade propellers, each of which
is 93 inches in diameter.  It is capable of producing 800 rpm's
on the engines to generate a speed at full throttle of over
15 miles per hour.  On the date of the accident it was pushing
two empty 130-foot x 30-foot deck barges tied up abreast.  These
deck barges draw approximately 1 foot of water and permit
passengers to board and disembark at locations where the water is
shallow.

        In its certificate of inspection, the MISSISSIPPI is
designated as a passenger inspected vessel rather than a pushboat
as it can accommodate up to 126 persons on board with overnight
accommodations for 42 passengers.  It serves as the headquarters
for the Mississippi River Commission.

        On the day of the accident, the MISSISSIPPI was
traveling southbound on the Atchafalaya River transporting
members of the Mississippi River Commission during a mandated low
water inspection tour.  Acting as the wheel men at the time were
the Assistant Master of the MISSISSIPPI, Leo Hendrix, and
Steersman Mate Cary Lewis who rotated shifts as pilot or, quote,

1    on the sticks, unquote, during their watch.  While on the sticks,

2    the pilot also acted as the lookout for the vessel.  There was

3    also a local pilot who was aboard to provide additional local

4    knowledge of the river conditions such as sandbars, shoals and

5    the like.

6        The navigation logbook records for the MISSISSIPPI

7    indicate the vessel entered the Atchafalaya River at Mile 1 at

8    9:00 o'clock a.m. on August 18, 2011.  At 12:15 p.m. it stopped

9    at the Atchafalaya Campground Landing at Mile Marker 45.8 to

10   allow passengers known as stakeholders because of their interests

11   in that area of the river to embark and disembark.  The vessel

12   departed downriver at 12:35 p.m.  During the time the vessel was

13   underway, the stakeholders were allowed free access to all areas

14   of the wheelhouse except the specific area surrounding the

15   pilot's console known as the corral.  The two pilots also

16   answered questions from the stakeholders while underway.  While

17   the pilot who was not on the sticks was primarily to answer

18   inquiries by the stakeholders, it did occur that the pilot on the

19   sticks would converse with the stakeholders.

20       The MISSISSIPPI and the ALLURA transmit Automatic

21   Identification Systems, hereinafter AIS, signals, which include

22   vessel identification information, latitude and longitude, speed

23   over ground in knots, and course over ground.  This system

24   permits vessels using the system to see each other on their AIS

25   displays even before visual contact is possible.  The time when

1   an AIS signal is received is synchronized to a clock maintained

2   in the U.S. Coast Guard Operations Systems Center.  In this case

3   the AIS signals of both vessels were being received by the same

4   Coast Guard Vessel Traffic Service base station in Port Allen,

5   Louisiana.

6           After the ALLURA was moored and shortly before the

7   incident, Captain Knott departed the ALLURA on a crewboat

8   captained by Troy Simar and headed northbound toward

9   Butte La Rose.  They encountered the southbound MISSISSIPPI at

10  approximately Mile Marker 83.3 upriver from the ALLURA.

11          Upon meeting the MISSISSIPPI, the crewboat maneuvered

12  to the right ascending bank, or east bank, of the Atchafalaya

13  River in order to ride out the wake produced by the MISSISSIPPI

14  estimated by Mr. Simar and Captain Knott to have been 5 to

15  6 feet.  The crewboat did not have AIS, but according to the AIS

16  data, which this Court accepts as accurate and reliable, the

17  MISSISSIPPI slowed its speed in the area where it encountered the

18  crewboat from 14 knots, or 16.1 miles per hour over ground, to

19  9.2 knots, or 10.59 miles per hour over ground, in less than two

20  minutes.

21          Of as much importance to this Court is the AIS data

22  reflects the MISSISSIPPI was at or near the middle of the

23  channel, and as indicated by the latitude/longitude data, its

24  course did not appreciably change to either the east or the west

25  during that time frame.  Under the circumstances as existed at

that time, the MISSISSIPPI was approaching a bend and oncoming
traffic with whom it had no agreement for passage head-on.
Therefore, the MISSISSIPPI was to have kept as near to the outer
limit of the channel, which lied to its starboard side, i.e. the
right descending bank or west bank, as is safe and practicable
consistent with the Inland Rules of Navigation, Rules 9 and 14.
That is the course that was taken by Mr. Simar, to alter his
course toward the outer limit of the channel to his starboard or
the right ascending bank or east bank that would be as safe and
practical.

Although both Knott and Simar described the wake as
approximately 5 to 6 feet, their description of the distance from
the MISSISSIPPI differed.  Simar thought the vessel was 15 to
20 yards away while Knott thought it was approximately 100 to
200 feet away.  Simar testified he believed their vessel was
approximately 3 to 4 feet from the right ascending or east bank.
According to the charts, the river is approximately 1,000 feet
wide at the location where the MISSISSIPPI encountered the
crewboat, the same width as the channel where the ALLURA was
moored.  The expert for the Corps of Engineers, Dr. Reed,
testified that the description by Captain Knott of a 5 to 6-foot
wake would be consistent at the distance he described.

Since the MISSISSIPPI was approximately in the middle
of the channel as the AIS data indicates, and the crewboat was
near the east bank as described by Simar, this Court finds that

1    at 9.2 knots, or 10.58 miles per hour over ground, the

2    MISSISSIPPI was throwing a wake of 5 to 6 feet a distance of

3    approximately 500 feet within two miles of the ALLURA.

4          After the MISSISSIPPI passed the crewboat, within two

5    minutes it had returned to a speed of up to 13.9 knots, or

6    15.99 miles per hour over ground, as it proceeded downriver

7    toward the position of the ALLURA.  Although the ALLURA was below

8    a bend and therefore could not be seen visually at the location

9    where the MISSISSIPPI encountered the crewboat, according to the

10   testimony of Cary Lewis, a couple of miles prior to encountering

11   the ALLURA he had picked up the ALLURA's AIS signature on his

12   GPS, and that would be Global Positioning System, and recognized

13   the vessel was not moving.  Based on the charts and the AIS data,

14   this contact would have to have occurred very shortly after the

15   encounter with Simar's crewboat.

16         Captain Lewis testified that it was when he made visual

17   contact with the ALLURA that he acted to reduce the speed of the

18   MISSISSIPPI.  At about that time, Captain Hendrix relieved Lewis

19   at the controls of the vessel in a normal position change.

20   During the relief briefing, Lewis pointed out the ALLURA to

21   Captain Hendrix.  The AIS data reflects that the initial

22   reduction in speed occurred at just after 16 minutes past the

23   hour.  Over the next minute the vessel's speed was reduced to

24   10.7 knots or 12.31 miles per hour over ground.  The vessel

25   continued to slowly reduce its speed to a low of 9.7 knots, or

1  11.16 miles per hour, at the point it was in the closest

2  proximity to the ALLURA.

3          Captain Lewis testified that he was aware the

4  MISSISSIPPI could potentially throw a dangerous wake and that it

5  was his custom to slow his speed to approximately 10 miles per

6  hour over ground to counteract the effect of the wake.  At no

7  time did the speed of the MISSISSIPPI get below 10 miles per hour

8  over ground when the MISSISSIPPI was in the visual range of the

9  ALLURA.  Lewis testified that he did not check the size of his

10  wake either before or after he was relieved by Hendrix and there

11  was no evidence that Hendrix did either.

12          Just before and at its closest proximity to the ALLURA,

13  the AIS data reflects that the MISSISSIPPI was not in the center

14  of the channel.  Rather, it was closer to the right descending or

15  west bank, and therefore, was closer to the ALLURA than it was to

16  the left descending or east bank.  At no time did the MISSISSIPPI

17  attempt to hail or otherwise make contact with the ALLURA.

18          Although Lewis testified he slowed his engines from 800

19  rounds per minute to 375 rounds per minute, which he classified

20  as idle or clutch speed, the over ground speed of the MISSISSIPPI

21  never got to or below 10 miles per hour, which he described as

22  his custom to minimize the effects of the wake of the

23  MISSISSIPPI.

24          The AIS data reflects multiple occasions during the

25  trip on the Atchafalaya on August 18 when the vessel had reduced

1    its speed to below 8.7 knots over ground in less than a mile,

2    including multiple occasions in the vicinity of the Interstate 10

3    bridge which was a couple of hours time earlier in the voyage

4    upriver from the position of the ALLURA.

5         The AIS data, consistent with the charts, illustrate

6    the ALLURA was approximately 500 feet from the MISSISSIPPI when

7    it passed at its closest point.  This Court does not accept the

8    opinion of Dr. Reed as to the size of the wake encountered by the

9    ALLURA as the foundations for that opinion were not sufficient to

10   compare to the conditions as they existed at the time of the

11   accident.

12        Specifically, the measurements taken in the

13   Mississippi River by the M/V MISSISSIPPI by Dr. Reed at that

14   location in the Mississippi River, the depth of the water was

15   significantly deeper than the depth of the Atchafalaya.

16   Nonetheless, the photographs taken by Dr. Reed demonstrated the

17   possibility of a 3-foot wave height on a bridge piling in the

18   main channel.

19        Captain Knott testified that the pilings on the dock

20   where the ALLURA was moored were 10 feet from the shoreline.  The

21   hydrogeologic map shows that the river bottom rises from 20 feet

22   below mean sea level to 5 feet above mean sea level within

23   100 feet of the shore.  Dr. Reed confirmed that waves would

24   steepen up as they approached the shoreline and that they would

25   not be behaving normally.

1          Dr. Reed ultimately opined that, even using his

2   computations, with a 2.1 amplitude wave as he described in his

3   supplemental report, notwithstanding the doubt which this Court

4   has as to the foundation for this calculation, that could

5   translate to a 4.2 wave from crest to trough.

6          Since, number one, Dr. Reed testified that the

7   conditions described by Captain Knott and Troy Simar would be

8   consistent at the distance described by Captain Knott, which this

9   Court finds by the AIS data was approximately the same distance

10   as the ALLURA was from the MISSISSIPPI, two, the speed of the

11   MISSISSIPPI was greater at the time it passed the ALLURA than it

12   was when it passed the crewboat, and a difference of .5 knots

13   over ground, would have increased the size of the wake, and,

14   three, the waves would not have been behaving normally as they

15   approached within 10 feet of the shoreline in low water

16   conditions, this Court finds that the ALLURA encountered a wake

17   wash of sufficient size to cause the plaintiff to lose his

18   balance as described below.  It is not necessary that this Court

19   determine that the wake size was 5 to 6 feet, but this Court

20   expressly does not find that the wake size was less than 1 foot

21   as set forth in the report of Dr. Reed.

22          After Captain Knott departed, plaintiff was alone on

23   the after deck when he spotted the MISSISSIPPI breaking the bend

24   upriver.  The plaintiff did not watch the MISSISSIPPI pass, but

25   returned to his job duties at hand to change the oil in the

1    engine room.

2          At the time the MISSISSIPPI approached and passed the

3    ALLURA, the plaintiff was attempting to descend an internal

4    ladder into the engine room.  To get to the engine room from the

5    after deck, the plaintiff passed through a doorway with an 8-inch

6    coaming into an interior space where a ladder with five or six

7    steps led down to the engine room deck.  The ladder has a single

8    steel handrail that, when facing the steps, would be to the

9    left-hand side.

10         Just before he fell, the plaintiff stood on the narrow

11   top of the ladder with two one-gallon jugs of oil in his left

12   hand preparing to descend the ladder.  As he turned, in the same

13   movement, he switched the two one-gallon jugs from his left hand

14   to his right hand so that he could grip the railing on his way

15   down.  It was during this transition, as he pivoted on the narrow

16   landing while switching the two one-gallon jugs of oil from his

17   left hand to his right, that he fell down the ladder as the

18   vessel rocked to the wake from the M/V MISSISSIPPI.

19         Following the incident, the plaintiff did not phone

20   Captain Knott or reach him by radio to report his injury.  He did

21   not try to call Stallion or the Coast Guard or the 24-hour

22   emergency phone number posted on the vessel, but he did report

23   the accident to Captain Knott the first thing the following

24   morning and the report was recorded in the vessel log.  The

25   initial report of the accident was consistent with the testimony

at trial and is consistent throughout the medical records and accident investigation documents.

Following the accident, the plaintiff was examined by Dr. Gregory Gidman, an orthopedist, whose examination was conducted at the behest of Stallion.  The plaintiff's complaints at that time were pain in the right shoulder area and the neck and lower back.  X-rays were taken of the right shoulder, neck and back, and Dr. Gidman diagnosed a neck strain, right shoulder strain, and lumbar strain.

Imaging studies of the cervical spine, lumbar spine, and right shoulder were done on August 29th, eleven days after the accident.  The MRI of the cervical spine was unremarkable. The MRI of the right shoulder revealed degenerative changes and a superior labral tear extending into the anterior labrum.  The MRI of the lumbar spine revealed degenerative disc disease with dessication and minimal disc bulge with no nerve root displacement at L4-5, and at L5-S1 there was minimal central disc herniation with no nerve root pathology.

Plaintiff was referred by Dr. Gidman to Dr. Fenn for evaluation of the right shoulder.  Dr. Fenn recommended physical therapy.

Dr. Louis Blanda, an orthopedic surgeon, examined the plaintiff on November 1, 2011.  He ordered a right shoulder arthrogram to confirm whether there was a rotator cuff tear.  The arthrogram was interpreted as normal.

1    By July 19, 2012, the plaintiff continued to be
2   symptomatic in the back and right shoulder.  Dr. Blanda ordered
3   an MRI of the lumbar spine and EMG/NCV studies.  The plaintiff
4   was continued on a no work status.
5    On October 18 the plaintiff complained of low back
6   pain, right shoulder pain, right hand pain with little finger and
7   ring finger numbness.  The EMG/NCV studies revealed borderline
8   right ulnar nerve entrapment neuropathy at the level of the
9   cubital tunnel.
10    On December 13, 2012, Dr. Gidman performed an IME of
11   the plaintiff rendering an assessment of neck strain, right
12   shoulder strain, and lumbar strain.  He stated that the plaintiff
13   was at maximum medical improvement for his cervical spine.  He
14   diagnosed chronic low back pain with a three percent whole body
15   impairment.  Dr. Gidman suggested a repeat MRI of the right
16   shoulder to determine if a SLAP lesion was present in the labrum,
17   in which event arthroscopy of the right shoulder would be
18   reasonable and the patient would not be at maximum medical
19   improvement.
20    On January 31, 2013, Dr. Blanda recorded his diagnoses
21   of a herniated lumbar disc and ulnar neuropathy.
22    On February 11, 2013, the plaintiff presented for
23   physical therapy at the Moreau Physical Therapy Clinic for
24   treatment of cervical pain, shoulder pain, and lumbar pain.
25    By March 28, 2013, Dr. Blanda was of the opinion the

1  plaintiff would probably need a minimum L5–S1 microdiscectomy and

2  right ulnar nerve transposition at the elbow.

3          On July 11 Dr. Gidman rendered an assessment of low

4  back pain and tardy ulnar nerve of the right arm.  Dr. Gidman

5  opined that plaintiff had reached MMI concerning the right

6  shoulder.  Dr. Gidman concurred with Dr. Blanda's diagnosis of

7  tardy ulnar nerve of the right arm and with Dr. Blanda's surgical

8  recommendation for the ulnar nerve palsy.  Dr. Gidman also

9  concurred for the series of three lumbar epidural steroid

10  injections to address the plaintiff's back complaints.

11          On July 22, 2013, an updated MRI of the lumbar spine

12  showed mild degenerative disc disease at L4–5 and L5–S1 with no

13  evidence of disc herniation.

14          On October 14, 2013, the plaintiff presented to

15  Dr. Daniel Hodges with the Physical Medicine and Rehabilitation

16  section of the Lafayette Bone and Joint Clinic for pain

17  management.  He remains under the care of Dr. Hodges to date.

18          On February 3, 2014, Dr. Blanda performed an ulnar

19  nerve decompression and anterior transposition at the right

20  elbow.  That surgery has resulted in a scar of approximately four

21  to five inches on the anterior side of the plaintiff's right arm

22  at the elbow.

23          The plaintiff has undergone three lumbar epidural

24  steroid injections at the hands of Dr. Steven Staires on July 20,

25  2013, September 5, 2013, and April 29, 2014.  On

May 15th Dr. Blanda noted that the plaintiff had had excellent results from the three lumbar epidural steroid injections. Dr. Gidman concurred with the reasonableness of Dr. Blanda's ulnar nerve surgery and the performance of the epidural steroid injections.

According to Dr. Blanda, the patient is currently at light duty work status and is unable to return to his former occupation.  Due to the injuries to his lumbar spine and elbow, Dr. Blanda has advised that he would extend the light duty restriction for a period of one year from the date of trial, and thereafter, if the plaintiff continues to improve, he may consider an elevation to medium duty.  Dr. Blanda opined that a restriction to light or medium duty was permanent in duration.

According to Dr. Gidman, the plaintiff has reached maximum cure for any cervical, shoulder, or lumbar condition. The plaintiff does not require a surgical intervention, additional lumbar steroid injections, or any formal therapy.  The plaintiff should reach maximum cure between December, 2014, and February, 2015, for his right arm.  The plaintiff can currently perform light work with the upper right extremity and a functional capacity evaluation is recommended to establish additional capabilities.  Thus, based on the opinions of both Dr. Blanda and Dr. Gidman, the plaintiff is not at maximum medical improvement at this point although he will hopefully reach maximum medical improvement sometime between the next nine

1    months to one year.

2           Both Dr. Blanda and Dr. Gidman relate the injuries to

3    the plaintiff's neck, back, shoulder, and elbow to the accident

4    of August 18, 2011.  Therefore, this Court finds that the

5    accident in which the plaintiff fell down the ladder of the

6    ALLURA as a result of losing his balance when the ALLURA was

7    impacted by the wave wash from the MISSISSIPPI was a cause in

8    fact of the injuries sustained by the plaintiff.  Specifically,

9    the labrum tear of the shoulder has resolved with no residual

10   problems, and Dr. Blanda has testified he recommends no further

11   treatment for that condition.  The cervical strain has also

12   resolved, and Dr. Blanda likewise makes no further treatment

13   recommendations for this.

14          The Court finds the accident caused an aggravation of a

15   preexisting lumbar disc disease which resulted in plaintiff's

16   treatment with three epidural steroid injection procedures.  This

17   condition has improved and is improving per Dr. Blanda, but it is

18   permanently disabling.  The Court finds the plaintiff's ulnar

19   nerve problems, presently resolving after the cubit tunnel

20   surgery, are also causally related to the August, 2011, accident.

21          The Court finds that the treatment of Dr. Blanda, both

22   past and future recommended in the form of conservative care and

23   surgical intervention, to be reasonable, medically necessary, and

24   directly related to the events of August 18, 2011.

25          The Court additionally finds that the restrictions

imposed by Dr. Blanda at this time are reasonable, indicating

that the plaintiff has a permanent restriction to light duty

which, at present, prevents his return to his occupation as a

deckhand or captain.

It is stipulated that Stallion has paid and continues

to pay maintenance and cure to or on behalf of the plaintiff as a

result of the accident and described injuries.  Maintenance

benefits of $28,732 have been paid since January, 2013, and cure

has been paid in the amount of $42,794.44, current as of May 27,

2014.  Stallion has provided plaintiff with total benefits of

$71,526.44 and continuing, in addition to $23,023.92 reimbursed

to Zurich, for a total of $94,550.36.  In addition, there is a

10,000-dollar deductible paid by Stallion for a total amount of

maintenance and cure paid in the amount of $104,550.36, which is

the subject of the stipulation previously read by the Court.

With respect to future medical costs, the Court accepts

the testimony of Dr. Blanda and Gidman that the plaintiff will

continue to need conservative treatment in the future.

Specifically, Dr. Blanda testified that plaintiff will need

periodic office visits with some prescription medications as well

as some physical therapy for the next two years.  Dr. Blanda

further testified that plaintiff is now limited to light duty

permanently with the hope that he may be able to move up to

medium duty at some point in the future.  However, this Court

cannot determine the cost for this treatment based on the

1  evidence presented as there is no specificity as to the need for

2  the medications involved, the duration of those medications, what

3  constitutes periodic visits, or the number and frequency of

4  physical therapy.  Therefore, while Stallion's obligation to

5  provide maintenance and cure continues until the plaintiff is

6  pronounced at maximum medical improvement, the Court cannot award

7  future medical expenses.

8       All right.  The Court accepts the opinions of the

9  vocational rehabilitation experts that the plaintiff's

10  post-accident earnings capacity at light duty ranges from a low

11  of approximately $8 per hour to a high of approximately $12 per

12  hour.

13       All right.  Those are the Court's findings of fact.

14       Now to the conclusions of law, first with regard to the

15  claims against Stallion under the Jones Act and General Maritime

16  Law.

17       Under the Jones Act, the employer owes a duty to its

18  employees who are seamen, including the duty of providing for the

19  safety of the crew, in other words, providing the plaintiff with

20  a reasonably safe place to work.  If the employer is negligent

21  and that negligent act caused the plaintiff's injury in whole or

22  in part, then the employer is liable under the Jones Act.

23       With regard to unseaworthiness, the owner of the vessel

24  has a duty to provide a seaworthy vessel, including the duty to

25  supply an adequate and competent crew.  The owner of the vessel

1   is not required to furnish an accident-free ship.  He need only

2   furnish a vessel and its appurtenances that are reasonably fit

3   for its intended use and a crew that is reasonably adequate for

4   its assigned task.

5        As to the liability of Stallion, there have been made

6   three arguments, specifically that the ALLURA was improperly

7   moored within the main body of the Atchafalaya where it would

8   face exposure to the wakes of passing vessels; second, that there

9   should have been one other person aboard the vessel with the

10   plaintiff to provide a lookout; and, third, that Captain Knott

11   should have radioed or otherwise contacted the plaintiff after

12   Captain Knott had encountered the wake of the passing

13   MISSISSIPPI.

14        With regard to the mooring of the ALLURA, this Court

15   does not find that Captain Knott acted unreasonably under the

16   circumstances.  At the time he made the decision to moor to a

17   dock, he viewed that decision as more reasonable than placing his

18   vessel in an inlet where it could have grounded overnight in the

19   face of falling water and already existing low water conditions.

20   Were this Court to find that it was negligent to dock at a dock

21   in the river, the consequences are astounding.  There is nothing

22   about the mooring lines that were put forth by Mr. Blanchard that

23   were in any way improper.

24        With regard to the issue of the lookout, the vessel was

25   not in service.  The vessel was docked at a dock.  There is only

1   a requirement in this Court's mind that one person be aboard the

2   vessel in the event the vessel breaks loose from its moorings or

3   takes on water or springs a leak, et cetera.  So the failure to

4   provide a lookout was not negligence on the part of Stallion.

5           With regard to the claim that Captain Knott should have

6   somehow returned or overtaken the MISSISSIPPI or otherwise

7   contacted the ALLURA to warn that the MISSISSIPPI was coming down

8   the river, it is reasonable for this Court to conclude that the

9   captain of the MISSISSIPPI would be expected to slow to a no wake

10  speed by anyone who is a mariner on the river.

11          The facts are that the crewboat rounded the bend at

12  approximately 32 miles per hour when it encountered the

13  MISSISSIPPI at which point the MISSISSIPPI slowed its speed.  So

14  the captain, Captain Knott, in this Court's view was acting

15  reasonably under the circumstances, and in fact the law allows

16  him to assume that the MISSISSIPPI would have slowed to a no wake

17  speed once it reached the ALLURA.

18          There is nothing about the mooring technique, the

19  positioning of the ALLURA, or the manning of the ALLURA that

20  renders the ALLURA unfit for its intended use.  Therefore, the

21  Court does not find Stallion was negligent under the Jones Act or

22  that the M/V ALLURA was unseaworthy.

23          The plaintiff has also made a claim for compensatory

24  damages arising out of the failure of Stallion to pay maintenance

25  and cure.  The Court previously read a stipulation which dictated

1  the circumstances under which there was a delay in paying

2  maintenance.  The plaintiff was brought back up current and all

3  of his medical bills were paid.

4         Upon receiving a claim for maintenance and cure, which

5  the underwriters did in this case after Zurich was no longer on

6  the case, the shipowner need not immediately commence payments.

7  He is entitled to investigate and require corroboration of the

8  claim.  If, after investigating, the ship owner rejects the claim

9  when in fact the seaman is due maintenance and cure, the owner

10 becomes liable not only for maintenance and cure payments, but

11 also for compensatory damages.  These are damages that are

12 resulted from the failure to pay, such as aggravation of the

13 seaman's condition determined by the usual principles applied in

14 tort cases to measure compensatory damages.  That would be

15 *Morales vs. Garijak*, *Inc.*, G-A-R-I-J-A-K, 829 F.2d 1355,

16 Fifth Circuit, 1987.

17        The Court finds that the three-month delay between the

18 time the plaintiff's maintenance benefits were terminated and

19 they were reinstated, that there were a number of things going

20 on.  Mr. Blanchard was changing addresses and not advising

21 Stallion.  He was changing lawyers, which is not Stallion's

22 fault.  He missed an appointment with Dr. Gidman.

23        When all of those things resolved -- the communication,

24 the legal representation, the examination by the IME, the

25 determination of whether Mr. Blanchard was in fact a Jones Act

1    Seaman under the employ of Stallion -- Stallion not only

2    reinstated maintenance, but brought the plaintiff up to date.

3    The Court does not find that Stallion unreasonably rejected the

4    plaintiff's claim for maintenance and cure and therefore denies

5    the award for compensatory damages on that basis.

6          With respect to the claims against the Army Corps of

7    Engineers, in order to prove -- the claims against the

8    Corps of Engineers are based on the General Maritime Law.  In

9    order to prove negligence under the General Maritime Law, the

10   plaintiff must demonstrate the following, that there was a duty

11   owed by the defendant to the plaintiff, that the duty was

12   breached, that the plaintiff sustained injury, and that there is

13   a causal connection between the defendant's conduct and the

14   plaintiff's injury.

15          *In re:  Signal International*, 579 F.3d 478,

16   Fifth Circuit, 2009.  The question of whether a duty is owed is a

17   question of law and it involves a number of factors, including

18   most notably the foreseeability of the harm suffered by the

19   complaining party.  Duty may be owed only with respect to the

20   interest that is foreseeably jeopardized by the negligent

21   conduct.  In the context of maritime torts, harm is considered to

22   be a foreseeable consequence of an act or omission if the harm of

23   a general sort to persons of a general class might have been

24   anticipated by a reasonably thoughtful person as a probable

25   result of the act or omission considering the interplay of

1    natural forces and likely human intervention.

2         *In re:  In the Matter of the Complaint of*

3    *Great Lakes Dredge and Dock*, 624 F.3d 201, Fifth Circuit,

4    2010.  The duty imposed on a vessel operator for its wake can be

5    found at 46 CFR § 185.304(a)(5), which states in pertinent part:

6    The movement of vessels shall be under the direction and control

7    of the master or licensed mate at all times.  The master shall

8    operate the vessel keeping the safety of the passengers and crew

9    foremost in mind by directing the vessel in order to prevent a

10   casualty.  Special attention should be paid to potential damage

11   caused by own wake.

12        So that's the duty.  The breach of the duty in this

13   case was that no attention was paid to the wake by either

14   Captain Lewis and apparently not by Captain Hendrix.  They did

15   not make any effort to determine the effect of their wake on the

16   bank, particularly after passing the crewboat, knowing that there

17   was a vessel moored.  I do not know and there was no evidence

18   presented to the Court whether there was a no wake zone sign

19   posted at the dock, but that is sometimes quite customary.

20        In any event, knowing that the vessel was moored,

21   knowing that the M/V MISSISSIPPI, which is of a large size, was

22   capable of throwing a dangerous wake, not measuring the size of

23   the wake or even looking for the size of the wake, and not

24   slowing to the usual and customary speed even advanced by

25   Captain Lewis, in this Court's mind is a breach of that duty.

1    This Court has already determined and found as a matter

2    of fact that the wave wash created by the M/V MISSISSIPPI was a

3    cause.  In fact, it was the only cause and it was a legal cause

4    of the accident which resulted in the injury to the plaintiff.

5    Therefore, the Court finds that the Corps of Engineers is liable

6    for the actions of its employees who piloted the M/V MISSISSIPPI

7    resulting in the injury to the plaintiff.

8        With regard to the comparative fault of the plaintiff,

9    the plaintiff is entitled to assume -- small craft have the right

10   to assume larger craft are aware of their presence and will

11   observe reasonable precautions.  That is *Moran vs. the Georgie*

12   *May*, 146 F.Supp 881, Southern District of Florida, 1958, as well

13   as *Alamia vs. Chevron Transportation*, 660 F.Supp 1123,

14   Southern District of Mississippi, 1987.

15       The plaintiff saw the MISSISSIPPI making the bend.  The

16   plaintiff returned to his work in my opinion reasonably relying

17   on the assumption granted to him by operation of law that the

18   MISSISSIPPI would reduce its speed such that its wake would not

19   cause damage to the vessel or to personnel.  Thus, the Court

20   finds the Army Corps of Engineers is 100 percent responsible for

21   the damages sustained by the plaintiff with no reduction for

22   comparative fault.

23       That brings us to damages.

24       The Court finds the plaintiff sustained injuries to his

25   neck, shoulder, elbow, and lower back as a direct result of the

incident on August 18 and that the plaintiff continues to suffer from chronic pain in his lower back and his right elbow as a result of these events. It appears as though they are resolving and it is the hope of this Court that they fully resolve.

The evidence presented by both the plaintiff and his treating physicians confirms the difficulties in daily living, the loss of enjoyment of life, both physical and mental pain and suffering as a result of the accident. Therefore, in terms of general damages due to the injuries suffered, for past pain and suffering and mental anguish, the Court awards $185,000. Given that Dr. Blanda is of the opinion that the lumbar epidural steroid injections are providing excellent relief, but that the plaintiff will probably need to remain on medications for at least the better part of a year, the Court awards future general damages in the amount of $15,000.

With regard to economic losses, this Court could find no authority for the proposition that the loss of earning capacity as set forth in Louisiana law under the Supreme Court decision of *Folse vs. Fakouri* applies in the context of a General Maritime Law case.

Future wage loss calculations in maritime cases are to be performed in compliance with methods set forth in *Culver vs. Slater Boat Company* commonly known as the Culver II process. This case established a four-step process for determining lost wages as follows: Number one, estimate the

1    worklife resulting from the injury, calculate the lost income

2    stream, compute the total amount of damages, discount the total

3    amount to its present value.

4         This Court struggled mightily with how to determine the

5    proper wage loss in this case.  The plaintiff demonstrated an

6    earning capacity in 2007 to earn up to $97,000 working in his

7    capacity as a vessel captain.  However, he lost his license due

8    to no fault of the defendants in this case and was out of that

9    license for a number of years despite doing his best efforts to

10   regain that license.  At the time of the accident, which is the

11   time when wages are to be determined, he did not have an earning

12   capacity of $97,000 per year.

13        The employment with Stallion was contract employment

14   with no guarantee that there would be more employment the day the

15   plaintiff left the job.  He worked 47 days during the time frame

16   from March 29, 2011, to June 9, 2011, earning $250 per day as a

17   unlicensed vessel captain for a total of $11,750.  He worked

18   seven more days in June at $160 per day as a deckhand, and then

19   he worked not at all in July.  He returned to work in August at a

20   rate of $160 per day, and at the time of his final paycheck, he

21   had worked 29 days at $160 per day for a total of $4,640.  This

22   Court averaged the exact number of days, which came out to an

23   amount of $215.65, but had no method by which to annualize that

24   rate of pay.

25        This Court also looked to the average of the

1    plaintiff's income over the past several years which this Court

2    does not feel adequately reflects the plaintiff's earning ability

3    at the time of the accident.  His wages in 2007 were $97,000 and

4    change and in other years they were $10,000, and while this Court

5    makes no finding of fact one way or the other whether the

6    plaintiff has appropriately reported all of his income, this

7    Court is of the distinct impression that the reported income to

8    the Internal Revenue Service probably is less.

9          Having done that, the Court accepts the opinion and the

10   method of calculation of economic losses by Dr. Ken Boudreaux

11   with regard to the plaintiff's base wage rate of $35,760.  That

12   results in a past wage loss of $80,121.48.  Based on the

13   estimated residual earning capacity at light duty employment for

14   the plaintiff, the Court accepts Dr. Boudreaux's opinion at net

15   of 50 percent capacity contained in his report at the upper limit

16   of the reasonable range and sets future wage losses at

17   $262,868.14.  Past medicals were stipulated in the amount of

18   $42,794.44 resulting in a judgment of $585,784.06 against the

19   government.

20         Finally, judicial interest under 46 U.S.C.

21   § 31107 may not include interest for a period before the judgment

22   is issued unless the claim is based on a contract, which it is

23   not, so pre-judgment interest is disallowed.  Post-judgment

24   interest would be allowed under 28 U.S.C. § 1961.

25         With regard to the crossclaim of Stallion, under

1   federal maritime law, a seaman's right to receive maintenance and

2   cure along with the shipowner's duty to pay is implied in the

3   employment contract between the parties and is in no sense

4   predicated upon the fault or negligence of the shipowner.

5   *Bertram vs. Freeport McMoran*, 35 F.3d 1008, Fifth Circuit, 1994.

6           And it has long been the law that the shipowner may

7   recover those payments from a third party whose negligence

8   partially or wholly caused the seaman's injury.  The *Bertram* case

9   as well as *Savoie vs. Lafouche Boat Rentals*, 627 F.2d 722,

10  Fifth Circuit, 1980.

11          This is based on the common sense principle that a

12  party whose neglect has caused or contributed to the need for

13  maintenance and cure payments should reimburse the cost of those

14  payments which would otherwise be borne by a nonnegligent or

15  passively negligent employer.  That is also the *Savoie* case at

16  page 723.

17          Therefore, the Court will enter judgment in favor of

18  Stallion and against the United States in the stipulated amount

19  of $104,550.36.

20          The Court is not going to calculate a lump sum payment

21  for future maintenance and cure payments as those numbers are

22  speculative at this point, but to the extent the plaintiff needs

23  to return to court to determine whether future maintenance and

24  cure is owed, the plaintiff is not foreclosed from that by this

25  Court's ruling.  Thus, Stallion's obligations continue.

1          To the extent Stallion needs to return to court for

2     indemnity on future maintenance and cure payments paid by or on

3     behalf of the plaintiff and sought to be recovered by way of

4     indemnity from the government, Stallion may do so.

5          The Court does not believe that the government is

6     entitled to a credit for past medical benefits paid in addition

7     to owing indemnity to Stallion although the Court is very

8     troubled by that.  The collateral source rule provides that a

9     tortfeasor is barred from reducing the damages it owes to a

10    plaintiff by the amount of recovery that plaintiff received from

11    sources of compensation independent of the tortfeasor.  That

12    would be *Johnson vs. Cenac Towing*, 544 F.3d 296, Fifth Circuit,

13    2008.

14         And, Mr. Ketyer, we looked hard and we found no

15    authority that would allow you a credit for that amount of money.

16    If you find it, the Court will gladly entertain a motion that is

17    timely filed.

18         Okay.  So judgment in favor of the plaintiff in the

19    amount of $585,784.06 plus post-judgment interest at the rate

20    provided by 28 U.S.C. § 1961 recovered entirely from the United

21    States.  Judgment in favor of Stallion against the

22    United States in the amount of $104,550.36 along with

23    post-judgment interest under 28 U.S.C. § 1961.

24         Stallion's obligations to continue paying maintenance

25    and cure under its maintenance and cure obligation remain in

1    place until the plaintiff reaches maximum medical improvement.

2    The government remains liable for any reimbursement of those

3    amounts provided they are related to and caused by the accident

4    that has been adjudicated in this lawsuit.

5              All right.  Any objections?

6              MR. WELBORN:  No objections from the plaintiff,

7    Your Honor.

8              MR. SOULE:  No objection from Stallion, Your Honor.

9              MR. KETYER:  Your Honor, we only ask that the record

10   reflect that there was no damage to the ALLURA or its lines.

11             THE COURT:  The Court will find as a fact that there

12   was no damage to the ALLURA or its lines.  The Court did not

13   apply the rule of the Pennsylvania in making its determination

14   that the wave wake caused the plaintiff's injury.  That's why I

15   didn't talk about it.

16             MR. KETYER:  Thank you.

17             THE COURT:  You're quite welcome.

18             Anything else?

19             All right.  This Court is adjourned.  Have a good

20   weekend.

21                       (Proceedings adjourned.)

22                        —  —  —

23

24

25

1                          Certificate

2    I hereby certify this 9th day of July, 2014, that the foregoing

3    is, to the best of my ability and understanding, a true and

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7                                    */s/ LaRae E. Bourque*

8                                    Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25